(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MURR ET AL. *v.* WISCONSIN ET AL.

### CERTIORARI TO THE COURT OF APPEALS OF WISCONSIN

No. 15–214. Argued March 20, 2017—Decided June 23, 2017

The St. Croix River, which forms part of the boundary between Wisconsin and Minnesota, is protected under federal, state, and local law. Petitioners own two adjacent lots—Lot E and Lot F—along the lower portion of the river in the town of Troy, Wisconsin. For the area where petitioners' property is located, state and local regulations prevent the use or sale of adjacent lots under common ownership as separate building sites unless they have at least one acre of land suitable for development. A grandfather clause relaxes this restriction for substandard lots which were in separate ownership from adjacent lands on January 1, 1976, the regulation's effective date.

Petitioners' parents purchased Lots E and F separately in the 1960's, and maintained them under separate ownership until transferring Lot F to petitioners in 1994 and Lot E to petitioners in 1995. Both lots are over one acre in size, but because of their topography they each have less than one acre suitable for development. The unification of the lots under common ownership therefore implicated the rules barring their separate sale or development. Petitioners became interested in selling Lot E as part of an improvement plan for the lots, and sought variances from the St. Croix County Board of Adjustment. The Board denied the request, and the state courts affirmed in relevant part. In particular, the State Court of Appeals found that the local ordinance effectively merged the lots, so petitioners could only sell or build on the single combined lot.

Petitioners filed suit, alleging that the regulations worked a regulatory taking that deprived them of all, or practically all, of the use of Lot E. The County Circuit Court granted summary judgment to the State, explaining that petitioners had other options to enjoy and use their property, including eliminating the cabin and building a new residence on either lot or across both. The court also found that peti-

tioners had not been deprived of all economic value of their property, because the decrease in market value of the unified lots was less than 10 percent. The State Court of Appeals affirmed, holding that the takings analysis properly focused on Lots E and F together and that, using that framework, the merger regulations did not effect a taking.

*Held*: The State Court of Appeals was correct to analyze petitioners' property as a single unit in assessing the effect of the challenged governmental action. Pp. 6–20.

 (a) The Court's Takings Clause jurisprudence informs the analysis of this issue. Pp. 6–11.

  (1) Regulatory takings jurisprudence recognizes that if a "regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415. This area of the law is characterized by "ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 322 (citation and internal quotation marks omitted).

 The Court has, however, identified two guidelines relevant for determining when a government regulation constitutes a taking. First, "with certain qualifications . . . a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Palazzolo* v. *Rhode Island*, 533 U. S. 606, 617 (quoting *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1015). Second, a taking may be found based on "a complex of factors," including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Palazzolo*, *supra,* at 617 (citing *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124). Yet even the complete deprivation of use under *Lucas* will not require compensation if the challenged limitations "inhere . . . in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership." *Lucas*, 505 U. S., at 1029.

 A central dynamic of the Court's regulatory takings jurisprudence thus is its flexibility. This is a means to reconcile two competing objectives central to regulatory takings doctrine: the individual's right to retain the interests and exercise the freedoms at the core of private property ownership, cf. *id.,* at 1027, and the government's power to "adjus[t] rights for the public good," *Andrus* v. *Allard*, 444 U. S. 51, 65. Pp. 6–9.

  (2) This case presents a critical question in determining whether a regulatory taking has occurred: What is the proper unit of property against which to assess the effect of the challenged governmental action? The Court has not set forth specific guidance on how to identify

the relevant parcel. However, it has declined to artificially limit the parcel to the portion of property targeted by the challenged regulation, and has cautioned against viewing property rights under the Takings Clause as coextensive with those under state law. Pp. 9–11.

(b) Courts must consider a number of factors in determining the proper denominator of the takings inquiry. Pp. 11–17.

(1) The inquiry is objective and should determine whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel or as separate tracts. First, courts should give substantial weight to the property's treatment, in particular how it is bounded or divided, under state and local law. Second, courts must look to the property's physical characteristics, including the physical relationship of any distinguishable tracts, topography, and the surrounding human and ecological environment. Third, courts should assess the property's value under the challenged regulation, with special attention to the effect of burdened land on the value of other holdings. Pp. 11–14.

(2) The formalistic rules for which the State of Wisconsin and petitioners advocate do not capture the central legal and factual principles informing reasonable expectations about property interests. Wisconsin would tie the definition of the parcel to state law, but it is also necessary to weigh whether the state enactments at issue accord with other indicia of reasonable expectations about property. Petitioners urge the Court to adopt a presumption that lot lines control, but lot lines are creatures of state law, which can be overridden by the State in the reasonable exercise of its power to regulate land. The merger provision here is such a legitimate exercise of state power, as reflected by its consistency with a long history of merger regulations and with the many merger provisions that exist nationwide today. Pp. 14–17.

(c) Under the appropriate multifactor standard, it follows that petitioners' property should be evaluated as a single parcel consisting of Lots E and F together. First, as to the property's treatment under state and local law, the valid merger of the lots under state law informs the reasonable expectation that the lots will be treated as a single property. Second, turning to the property's physical characteristics, the lots are contiguous. Their terrain and shape make it reasonable to expect their range of potential uses might be limited; and petitioners could have anticipated regulation of the property due to its location along the river, which was regulated by federal, state, and local law long before they acquired the land. Third, Lot E brings prospective value to Lot F. The restriction on using the individual lots is mitigated by the benefits of using the property as an integrated whole, allowing increased privacy and recreational space, plus an

optimal location for any improvements. This relationship is evident in the lots' combined valuation. The Court of Appeals was thus correct to treat the contiguous properties as one parcel.

Considering petitioners' property as a whole, the state court was correct to conclude that petitioners cannot establish a compensable taking. They have not suffered a taking under *Lucas*, as they have not been deprived of all economically beneficial use of their property. See 505 U. S., at 1019. Nor have they suffered a taking under the more general test of *Penn Central*, *supra,* at 124. Pp. 17–20.

2015 WI App 13, 359 Wis. 2d 675, 859 N. W. 2d 628, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion. GORSUCH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–214

## JOSEPH P. MURR, ET AL., PETITIONERS *v.* WISCONSIN, ET AL.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF WISCONSIN, DISTRICT III

[June 23, 2017]

JUSTICE KENNEDY delivered the opinion of the Court.

The classic example of a property taking by the government is when the property has been occupied or otherwise seized. In the case now before the Court, petitioners contend that governmental entities took their real property—an undeveloped residential lot—not by some physical occupation but instead by enacting burdensome regulations that forbid its improvement or separate sale because it is classified as substandard in size. The relevant governmental entities are the respondents.

Against the background justifications for the challenged restrictions, respondents contend there is no regulatory taking because petitioners own an adjacent lot. The regulations, in effecting a merger of the property, permit the continued residential use of the property including for a single improvement to extend over both lots. This retained right of the landowner, respondents urge, is of sufficient offsetting value that the regulation is not severe enough to be a regulatory taking. To resolve the issue whether the landowners can insist on confining the analysis just to the lot in question, without regard to their

ownership of the adjacent lot, it is necessary to discuss the background principles that define regulatory takings.

# I
## A

The St. Croix River originates in northwest Wisconsin and flows approximately 170 miles until it joins the Mississippi River, forming the boundary between Minnesota and Wisconsin for much of its length. The lower portion of the river slows and widens to create a natural water area known as Lake St. Croix. Tourists and residents of the region have long extolled the picturesque grandeur of the river and surrounding area. *E.g.,* E. Ellett, Summer Rambles in the West 136–137 (1853).

Under the Wild and Scenic Rivers Act, the river was designated, by 1972, for federal protection. §3(a)(6), 82 Stat. 908, 16 U. S. C. §1274(a)(6) (designating Upper St. Croix River); Lower Saint Croix River Act of 1972, §2, 86 Stat. 1174, 16 U. S. C. §1274(a)(9) (adding Lower St. Croix River). The law required the States of Wisconsin and Minnesota to develop "a management and development program" for the river area. 41 Fed. Reg. 26237 (1976). In compliance, Wisconsin authorized the State Department of Natural Resources to promulgate rules limiting development in order to "guarantee the protection of the wild, scenic and recreational qualities of the river for present and future generations." Wis. Stat. §30.27(l) (1973).

Petitioners are two sisters and two brothers in the Murr family. Petitioners' parents arranged for them to receive ownership of two lots the family used for recreation along the Lower St. Croix River in the town of Troy, Wisconsin. The lots are adjacent, but the parents purchased them separately, put the title of one in the name of the family business, and later arranged for transfer of the two lots, on different dates, to petitioners. The lots, which are referred to in this litigation as Lots E and F, are described

in more detail below.

For the area where petitioners' property is located, the Wisconsin rules prevent the use of lots as separate building sites unless they have at least one acre of land suitable for development. Wis. Admin. Code §§ NR 118.04(4), 118.03(27), 118.06(1)(a)(2)(a), 118.06(1)(b) (2017). A grandfather clause relaxes this restriction for substandard lots which were "in separate ownership from abutting lands" on January 1, 1976, the effective date of the regulation. § NR 118.08(4)(a)(1). The clause permits the use of qualifying lots as separate building sites. The rules also include a merger provision, however, which provides that adjacent lots under common ownership may not be "sold or developed as separate lots" if they do not meet the size requirement. § NR 118.08(4)(a)(2). The Wisconsin rules require localities to adopt parallel provisions, see § NR 118.02(3), so the St. Croix County zoning ordinance contains identical restrictions, see St. Croix County, Wis., Ordinance §17.36I.4.a (2005). The Wisconsin rules also authorize the local zoning authority to grant variances from the regulations where enforcement would create "unnecessary hardship." § NR 118.09(4)(b); St. Croix County Ordinance §17.09.232.

B

Petitioners' parents purchased Lot F in 1960 and built a small recreational cabin on it. In 1961, they transferred title to Lot F to the family plumbing company. In 1963, they purchased neighboring Lot E, which they held in their own names.

The lots have the same topography. A steep bluff cuts through the middle of each, with level land suitable for development above the bluff and next to the water below it. The line dividing Lot E from Lot F runs from the riverfront to the far end of the property, crossing the blufftop along the way. Lot E has approximately 60 feet of river

frontage, and Lot F has approximately 100 feet. Though each lot is approximately 1.25 acres in size, because of the waterline and the steep bank they each have less than one acre of land suitable for development. Even when combined, the lots' buildable land area is only 0.98 acres due to the steep terrain.

The lots remained under separate ownership, with Lot F owned by the plumbing company and Lot E owned by petitioners' parents, until transfers to petitioners. Lot F was conveyed to them in 1994, and Lot E was conveyed to them in 1995. *Murr* v. *St. Croix County Bd. of Adjustment*, 2011 WI App 29, 332 Wis. 2d 172, 177–178, 184–185, 796 N. W. 2d 837, 841, 844 (2011); 2015 WI App 13, 359 Wis. 2d 675, 859 N. W. 2d 628 (unpublished opinion), App. to Pet. for Cert. A–3, ¶¶4–5. (There are certain ambiguities in the record concerning whether the lots had merged earlier, but the parties and the courts below appear to have assumed the merger occurred upon transfer to petitioners.)

A decade later, petitioners became interested in moving the cabin on Lot F to a different portion of the lot and selling Lot E to fund the project. The unification of the lots under common ownership, however, had implicated the state and local rules barring their separate sale or development. Petitioners then sought variances from the St. Croix County Board of Adjustment to enable their building and improvement plan, including a variance to allow the separate sale or use of the lots. The Board denied the requests, and the state courts affirmed in relevant part. In particular, the Wisconsin Court of Appeals agreed with the Board's interpretation that the local ordinance "effectively merged" Lots E and F, so petitioners "could only sell or build on the single larger lot." *Murr*, *supra*, at 184, 796 N. W. 2d, at 844.

Petitioners filed the present action in state court, alleging that the state and county regulations worked a regula-

tory taking by depriving them of "all, or practically all, of the use of Lot E because the lot cannot be sold or developed as a separate lot." App. 9. The parties each submitted appraisal numbers to the trial court. Respondents' appraisal included values of $698,300 for the lots together as regulated; $771,000 for the lots as two distinct buildable properties; and $373,000 for Lot F as a single lot with improvements. Record 17–55, 17–56. Petitioners' appraisal included an unrebutted, estimated value of $40,000 for Lot E as an undevelopable lot, based on the counterfactual assumption that it could be sold as a separate property. *Id.,* at 22–188.

The Circuit Court of St. Croix County granted summary judgment to the State, explaining that petitioners retained "several available options for the use and enjoyment of their property." Case No. 12–CV–258 (Oct. 31, 2013), App. to Pet. for Cert. B–9. For example, they could preserve the existing cabin, relocate the cabin, or eliminate the cabin and build a new residence on Lot E, on Lot F, or across both lots. The court also found petitioners had not been deprived of all economic value of their property. Considering the valuation of the property as a single lot versus two separate lots, the court found the market value of the property was not significantly affected by the regulations because the decrease in value was less than 10 percent. *Ibid.*

The Wisconsin Court of Appeals affirmed. The court explained that the regulatory takings inquiry required it to "'first determine what, precisely, is the property at issue.'" *Id.,* at A–9, ¶17. Relying on Wisconsin Supreme Court precedent in *Zealy* v. *Waukesha*, 201 Wis. 2d 365, 548 N. W. 2d 528 (1996), the Court of Appeals rejected petitioners' request to analyze the effect of the regulations on Lot E only. Instead, the court held the takings analysis "properly focused" on the regulations' effect "on the Murrs' property as a whole"—that is, Lots E and F together. App.

to Pet. for Cert. A–12, ¶22.

Using this framework, the Court of Appeals concluded the merger regulations did not effect a taking. In particular, the court explained that petitioners could not reasonably have expected to use the lots separately because they were "'charged with knowledge of the existing zoning laws'" when they acquired the property. *Ibid.* (quoting *Murr*, *supra*, at 184, 796 N. W. 2d, at 844). Thus, "even if [petitioners] did intend to develop or sell Lot E separately, that expectation of separate treatment became unreasonable when they chose to acquire Lot E in 1995, after their having acquired Lot F in 1994." App. to Pet. for Cert. A–17, ¶30. The court also discounted the severity of the economic impact on petitioners' property, recognizing the Circuit Court's conclusion that the regulations diminished the property's combined value by less than 10 percent. The Supreme Court of Wisconsin denied discretionary review. This Court granted certiorari, 577 U. S. ___ (2016).

## II
### A

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." The Clause is made applicable to the States through the Fourteenth Amendment. *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897). As this Court has recognized, the plain language of the Takings Clause "requires the payment of compensation whenever the government acquires private property for a public purpose," see *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 321 (2002), but it does not address in specific terms the imposition of regulatory burdens on private property. Indeed, "[p]rior to Justice Holmes's exposition in *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922), it was

generally thought that the Takings Clause reached only a direct appropriation of property, or the functional equivalent of a practical ouster of the owner's possession," like the permanent flooding of property. *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1014 (1992) (citation, brackets, and internal quotation marks omitted); accord, *Horne* v. *Department of Agriculture*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 7); see also *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 427 (1982). *Mahon*, however, initiated this Court's regulatory takings jurisprudence, declaring that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U. S., at 415. A regulation, then, can be so burdensome as to become a taking, yet the *Mahon* Court did not formulate more detailed guidance for determining when this limit is reached.

In the near century since *Mahon*, the Court for the most part has refrained from elaborating this principle through definitive rules. This area of the law has been characterized by "ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra*, *supra*, at 322 (citation and internal quotation marks omitted). The Court has, however, stated two guidelines relevant here for determining when government regulation is so onerous that it constitutes a taking. First, "with certain qualifications . . . a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Palazzolo* v. *Rhode Island*, 533 U. S. 606, 617 (2001) (quoting *Lucas*, *supra*, at 1015). Second, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on "a complex of factors," including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the char-

acter of the governmental action. *Palazzolo, supra,* at 617
(citing *Penn Central Transp. Co.* v. *New York City*, 438
U. S. 104, 124 (1978)).

By declaring that the denial of all economically benefi-
cial use of land constitutes a regulatory taking, *Lucas*
stated what it called a "categorical" rule. See 505 U. S., at
1015. Even in *Lucas*, however, the Court included a ca-
veat recognizing the relevance of state law and land-use
customs: The complete deprivation of use will not re-
quire compensation if the challenged limitations "inhere
. . . in the restrictions that background principles of the
State's law of property and nuisance already placed upon
land ownership." *Id.*, at 1029; see also *id.,* at 1030–1031
(listing factors for courts to consider in making this
determination).

A central dynamic of the Court's regulatory takings
jurisprudence, then, is its flexibility. This has been and
remains a means to reconcile two competing objectives
central to regulatory takings doctrine. One is the individ-
ual's right to retain the interests and exercise the free-
doms at the core of private property ownership. Cf. *id.*, at
1028 ("[T]he notion . . . that title is somehow held subject
to the 'implied limitation' that the State may subsequently
eliminate all economically valuable use is inconsistent
with the historical compact recorded in the Takings
Clause that has become part of our constitutional cul-
ture"). Property rights are necessary to preserve freedom,
for property ownership empowers persons to shape and to
plan their own destiny in a world where governments are
always eager to do so for them.

The other persisting interest is the government's well-
established power to "adjus[t] rights for the public good."
*Andrus* v. *Allard*, 444 U. S. 51, 65 (1979). As Justice
Holmes declared, "Government hardly could go on if to
some extent values incident to property could not be di-
minished without paying for every such change in the

general law." *Mahon*, *supra*, at 413. In adjudicating regulatory takings cases a proper balancing of these principles requires a careful inquiry informed by the specifics of the case. In all instances, the analysis must be driven "by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo*, *supra*, at 617–618 (quoting *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960)).

B

This case presents a question that is linked to the ultimate determination whether a regulatory taking has occurred: What is the proper unit of property against which to assess the effect of the challenged governmental action? Put another way, "[b]ecause our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'" *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 497 (1987) (quoting Michelman, Property, Utility, and Fairness, 80 Harv. L. Rev. 1165, 1992 (1967)).

As commentators have noted, the answer to this question may be outcome determinative. See Eagle, The Four-Factor *Penn Central* Regulatory Takings Test, 118 Pa. St. L. Rev. 601, 631 (2014); see also Wright, A New Time for Denominators, 34 Env. L. 175, 180 (2004). This Court, too, has explained that the question is important to the regulatory takings inquiry. "To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question." *Concrete Pipe & Products of Cal., Inc.* v. *Con-*

*struction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 644 (1993).

Defining the property at the outset, however, should not necessarily preordain the outcome in every case. In some, though not all, cases the effect of the challenged regulation must be assessed and understood by the effect on the entire property held by the owner, rather than just some part of the property that, considered just on its own, has been diminished in value. This demonstrates the contrast between regulatory takings, where the goal is usually to determine how the challenged regulation affects the property's value to the owner, and physical takings, where the impact of physical appropriation or occupation of the property will be evident.

While the Court has not set forth specific guidance on how to identify the relevant parcel for the regulatory taking inquiry, there are two concepts which the Court has indicated can be unduly narrow.

First, the Court has declined to limit the parcel in an artificial manner to the portion of property targeted by the challenged regulation. In *Penn Central*, for example, the Court rejected a challenge to the denial of a permit to build an office tower above Grand Central Terminal. The Court refused to measure the effect of the denial only against the "air rights" above the terminal, cautioning that "'[t]aking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." 438 U. S., at 130.

In a similar way, in *Tahoe-Sierra*, the Court refused to "effectively sever" the 32 months during which petitioners' property was restricted by temporary moratoria on development "and then ask whether that segment ha[d] been taken in its entirety." 535 U. S., at 331. That was because "defining the property interest taken in terms of the very regulation being challenged is circular." *Ibid.* That ap-

proach would overstate the effect of regulation on property, turning "every delay" into a "total ban." *Ibid.*

The second concept about which the Court has expressed caution is the view that property rights under the Takings Clause should be coextensive with those under state law. Although property interests have their foundations in state law, the *Palazzolo* Court reversed a state-court decision that rejected a takings challenge to regulations that predated the landowner's acquisition of title. 533 U. S., at 626–627. The Court explained that States do not have the unfettered authority to "shape and define property rights and reasonable investment-backed expectations," leaving landowners without recourse against unreasonable regulations. *Id.*, at 626.

By the same measure, defining the parcel by reference to state law could defeat a challenge even to a state enactment that alters permitted uses of property in ways inconsistent with reasonable investment-backed expectations. For example, a State might enact a law that consolidates nonadjacent property owned by a single person or entity in different parts of the State and then imposes development limits on the aggregate set. If a court defined the parcel according to the state law requiring consolidation, this improperly would fortify the state law against a takings claim, because the court would look to the retained value in the property as a whole rather than considering whether individual holdings had lost all value.

### III
#### A

As the foregoing discussion makes clear, no single consideration can supply the exclusive test for determining the denominator. Instead, courts must consider a number of factors. These include the treatment of the land under state and local law; the physical characteristics of the land; and the prospective value of the regulated land. The

endeavor should determine whether reasonable expecta-
tions about property ownership would lead a landowner to
anticipate that his holdings would be treated as one par-
cel, or, instead, as separate tracts. The inquiry is objec-
tive, and the reasonable expectations at issue derive from
background customs and the whole of our legal tradition.
Cf. *Lucas*, 505 U. S., at 1035 (KENNEDY, J., concurring)
("The expectations protected by the Constitution are based
on objective rules and customs that can be understood as
reasonable by all parties involved").

First, courts should give substantial weight to the
treatment of the land, in particular how it is bounded or
divided, under state and local law. The reasonable expec-
tations of an acquirer of land must acknowledge legitimate
restrictions affecting his or her subsequent use and dis-
pensation of the property. See *Ballard* v. *Hunter*, 204
U. S. 241, 262 (1907) ("Of what concerns or may concern
their real estate men usually keep informed, and on that
probability the law may frame its proceedings"). A valid
takings claim will not evaporate just because a purchaser
took title after the law was enacted. See *Palazzolo*, 533
U. S., at 627 (some "enactments are unreasonable and do
not become less so through passage of time or title"). A
reasonable restriction that predates a landowner's acquisi-
tion, however, can be one of the objective factors that most
landowners would reasonably consider in forming fair
expectations about their property. See *ibid.* ("[A] prospec-
tive enactment, such as a new zoning ordinance, can limit
the value of land without effecting a taking because it can
be understood as reasonable by all concerned"). In
a similar manner, a use restriction which is triggered
only after, or because of, a change in ownership should
also guide a court's assessment of reasonable private
expectations.

Second, courts must look to the physical characteristics
of the landowner's property. These include the physical

relationship of any distinguishable tracts, the parcel's topography, and the surrounding human and ecological environment. In particular, it may be relevant that the property is located in an area that is subject to, or likely to become subject to, environmental or other regulation. Cf. *Lucas*, *supra*, at 1035 (KENNEDY, J., concurring) ("Coastal property may present such unique concerns for a fragile land system that the State can go further in regulating its development and use than the common law of nuisance might otherwise permit").

Third, courts should assess the value of the property under the challenged regulation, with special attention to the effect of burdened land on the value of other holdings. Though a use restriction may decrease the market value of the property, the effect may be tempered if the regulated land adds value to the remaining property, such as by increasing privacy, expanding recreational space, or preserving surrounding natural beauty. A law that limits use of a landowner's small lot in one part of the city by reason of the landowner's nonadjacent holdings elsewhere may decrease the market value of the small lot in an unmitigated fashion. The absence of a special relationship between the holdings may counsel against consideration of all the holdings as a single parcel, making the restrictive law susceptible to a takings challenge. On the other hand, if the landowner's other property is adjacent to the small lot, the market value of the properties may well increase if their combination enables the expansion of a structure, or if development restraints for one part of the parcel protect the unobstructed skyline views of another part. That, in turn, may counsel in favor of treatment as a single parcel and may reveal the weakness of a regulatory takings challenge to the law.

State and federal courts have considerable experience in adjudicating regulatory takings claims that depart from these examples in various ways. The Court anticipates

that in applying the test above they will continue to exer-
cise care in this complex area.

B

The State of Wisconsin and petitioners each ask this
Court to adopt a formalistic rule to guide the parcel in-
quiry.   Neither proposal suffices to capture the central
legal and factual principles that inform reasonable expec-
tations about property interests.

Wisconsin would tie the definition of the parcel to state
law, considering the two lots here as a single whole due to
their merger under the challenged regulations.    That
approach, as already noted, simply assumes the answer to
the question: May the State define the relevant parcel in a
way that permits it to escape its responsibility to justify
regulation in light of legitimate property expectations?  It
is, of course, unquestionable that the law must recognize
those legitimate expectations in order to give proper
weight to the rights of owners and the right of the State to
pass reasonable laws and regulations.     See *Palazzolo*,
*supra*, at 627.

Wisconsin bases its position on a footnote in *Lucas*,
which suggests the answer to the denominator question
"may lie in how the owner's reasonable expectations have
been shaped by the State's law of property—*i.e.,* whether
and to what degree the State's law has accorded legal
recognition and protection to the particular interest in
land with respect to which the takings claimant alleges a
diminution in (or elimination of) value."   505 U. S., at
1017, n. 7.   As an initial matter, *Lucas* referenced the
parcel problem only in dicta, unnecessary to the an-
nouncement or application of the rule it established.   See
*ibid.* ("[W]e avoid th[e] difficulty" of determining the rele-
vant parcel "in the present case").   In any event, the test
the Court adopts today is consistent with the respect for
state law described in *Lucas*.   The test considers state law

but in addition weighs whether the state enactments at issue accord with other indicia of reasonable expectations about property.

Petitioners propose a different test that is also flawed. They urge the Court to adopt a presumption that lot lines define the relevant parcel in every instance, making Lot E the necessary denominator. Petitioners' argument, however, ignores the fact that lot lines are themselves creatures of state law, which can be overridden by the State in the reasonable exercise of its power. In effect, petitioners ask this Court to credit the aspect of state law that favors their preferred result (lot lines) and ignore that which does not (merger provision).

This approach contravenes the Court's case law, which recognizes that reasonable land-use regulations do not work a taking. See *Palazzolo*, 533 U. S., at 627; *Mahon*, 260 U. S., at 413. Among other cases, *Agins* v. *City of Tiburon*, 447 U. S. 255 (1980), demonstrates the validity of this proposition because it upheld zoning regulations as a legitimate exercise of the government's police power. Of course, the Court's later opinion in *Lingle* v. *Chevron U. S. A. Inc.* recognized that the test articulated in *Agins*—that regulation effects a taking if it "'does not substantially advance legitimate state interests'"—was improper because it invited courts to engage in heightened review of the effectiveness of government regulation. 544 U. S. 528, 540 (2005) (quoting *Agins*, *supra*, at 260). *Lingle* made clear, however, that the holding of *Agins* survived, even if its test was "imprecis[e]." See 544 U. S., at 545–546, 548.

The merger provision here is likewise a legitimate exercise of government power, as reflected by its consistency with a long history of state and local merger regulations that originated nearly a century ago. See Brief for National Association of Counties et al. as *Amici Curiae* 5–10. Merger provisions often form part of a regulatory scheme

that establishes a minimum lot size in order to preserve open space while still allowing orderly development. See E. McQuillin, Law of Municipal Corporations §25:24 (3d ed. 2010); see also *Agins*, *supra*, at 262 (challenged "zoning ordinances benefit[ed] the appellants as well as the public by serving the city's interest in assuring careful and orderly development of residential property with provision for open-space areas").

When States or localities first set a minimum lot size, there often are existing lots that do not meet the new requirements, and so local governments will strive to reduce substandard lots in a gradual manner. The regulations here represent a classic way of doing this: by implementing a merger provision, which combines contiguous substandard lots under common ownership, alongside a grandfather clause, which preserves adjacent substandard lots that are in separate ownership. Also, as here, the harshness of a merger provision may be ameliorated by the availability of a variance from the local zoning authority for landowners in special circumstances. See 3 E. Ziegler, Rathkopf's Law of Zoning and Planning §49:13 (39th ed. 2017).

Petitioners' insistence that lot lines define the relevant parcel ignores the well-settled reliance on the merger provision as a common means of balancing the legitimate goals of regulation with the reasonable expectations of landowners. Petitioners' rule would frustrate municipalities' ability to implement minimum lot size regulations by casting doubt on the many merger provisions that exist nationwide today. See Brief for National Association of Counties et al. as *Amici Curiae* 12–31 (listing over 100 examples of merger provisions).

Petitioners' reliance on lot lines also is problematic for another reason. Lot lines have varying degrees of formality across the States, so it is difficult to make them a standard measure of the reasonable expectations of property

owners. Indeed, in some jurisdictions, lot lines may be subject to informal adjustment by property owners, with minimal government oversight. See Brief for California et al. as *Amici Curiae* 17; 1 J. Kushner, Subdivision Law and Growth Management §5:8 (2d ed. 2017) (lot line adjustments that create no new parcels are often exempt from subdivision review); see, *e.g.,* Cal. Govt. Code Ann. §66412(d) (West 2016) (permitting adjustment of lot lines subject to limited conditions for government approval). The ease of modifying lot lines also creates the risk of gamesmanship by landowners, who might seek to alter the lines in anticipation of regulation that seems likely to affect only part of their property.

## IV

Under the appropriate multifactor standard, it follows that for purposes of determining whether a regulatory taking has occurred here, petitioners' property should be evaluated as a single parcel consisting of Lots E and F together.

First, the treatment of the property under state and local law indicates petitioners' property should be treated as one when considering the effects of the restrictions. As the Wisconsin courts held, the state and local regulations merged Lots E and F. *E.g.,* App. to Pet. for Cert. A–3, ¶6 ("The 1995 transfer of Lot E brought the lots under common ownership and resulted in a merger of the two lots under [the local ordinance]"). The decision to adopt the merger provision at issue here was for a specific and legitimate purpose, consistent with the widespread understanding that lot lines are not dominant or controlling in every case. See *supra,* at \_\_\_. Petitioners' land was subject to this regulatory burden, moreover, only because of voluntary conduct in bringing the lots under common ownership after the regulations were enacted. As a result, the valid merger of the lots under state law informs the

reasonable expectation they will be treated as a single property.

Second, the physical characteristics of the property support its treatment as a unified parcel. The lots are contiguous along their longest edge. Their rough terrain and narrow shape make it reasonable to expect their range of potential uses might be limited. Cf. App. to Pet. for Cert. A–5, ¶8 ("[Petitioners] asserted Lot E could not be put to alternative uses like agriculture or commerce due to its size, location and steep terrain"). The land's location along the river is also significant. Petitioners could have anticipated public regulation might affect their enjoyment of their property, as the Lower St. Croix was a regulated area under federal, state, and local law long before petitioners possessed the land.

Third, the prospective value that Lot E brings to Lot F supports considering the two as one parcel for purposes of determining if there is a regulatory taking. Petitioners are prohibited from selling Lots E and F separately or from building separate residential structures on each. Yet this restriction is mitigated by the benefits of using the property as an integrated whole, allowing increased privacy and recreational space, plus the optimal location of any improvements. See Case No. 12–CV–258, App. to Pet. for Cert. B–9 ("They have an elevated level of privacy because they do not have close neighbors and are able to swim and play volleyball at the property").

The special relationship of the lots is further shown by their combined valuation. Were Lot E separately saleable but still subject to the development restriction, petitioners' appraiser would value the property at only $40,000. We express no opinion on the validity of this figure. We also note the number is not particularly helpful for understanding petitioners' retained value in the properties because Lot E, under the regulations, cannot be sold without Lot F. The point that is useful for these purposes is

that the combined lots are valued at $698,300, which is far greater than the summed value of the separate regulated lots (Lot F with its cabin at $373,000, according to respondents' appraiser, and Lot E as an undevelopable plot at $40,000, according to petitioners' appraiser). The value added by the lots' combination shows their complementarity and supports their treatment as one parcel.

The State Court of Appeals was correct in analyzing petitioners' property as a single unit. Petitioners allege that in doing so, the state court applied a categorical rule that all contiguous, commonly owned holdings must be combined for Takings Clause analysis. See Brief for Petitioners i ("[D]oes the 'parcel as a whole' concept . . . establish a rule that two legally distinct, but commonly owned contiguous parcels, must be combined for takings analysis purposes"). This does not appear to be the case, however, for the precedent relied on by the Court of Appeals addressed multiple factors before treating contiguous properties as one parcel. See App. to Pet. for Cert. A–9–A–11, ¶¶17–19 (citing *Zealy* v. *Waukesha*, 201 Wis. 2d 365, 548 N. W. 2d 528); see *id.,* at 378, 548 N. W. 2d, at 533 (considering the property as a whole because it was "part of a single purchase" and all 10.4 acres were undeveloped). The judgment below, furthermore, may be affirmed on any ground permitted by the law and record. See *Thigpen* v. *Roberts*, 468 U. S. 27, 30 (1984). To the extent the state court treated the two lots as one parcel based on a bright-line rule, nothing in this opinion approves that methodology, as distinct from the result.

Considering petitioners' property as a whole, the state court was correct to conclude that petitioners cannot establish a compensable taking in these circumstances. Petitioners have not suffered a taking under *Lucas*, as they have not been deprived of all economically beneficial use of their property. See 505 U. S., at 1019. They can use the property for residential purposes, including an

enhanced, larger residential improvement.  See *Palazzolo*, 533 U. S., at 631 ("A regulation permitting a landowner to build a substantial residence . . . does not leave the property 'economically idle'").  The property has not lost all economic value, as its value has decreased by less than 10 percent.  See *Lucas*, *supra*, at 1019, n. 8 (suggesting that even a landowner with 95 percent loss may not recover).

Petitioners furthermore have not suffered a taking under the more general test of *Penn Central*.  See 438 U. S., at 124. The expert appraisal relied upon by the state courts refutes any claim that the economic impact of the regulation is severe.  Petitioners cannot claim that they reasonably expected to sell or develop their lots separately given the regulations which predated their acquisition of both lots.  Finally, the governmental action was a reasonable land-use regulation, enacted as part of a coordinated federal, state, and local effort to preserve the river and surrounding land.

*      *      *

Like the ultimate question whether a regulation has gone too far, the question of the proper parcel in regulatory takings cases cannot be solved by any simple test.  See *Arkansas Game and Fish Comm'n* v. *United States*, 568 U. S. 23, 31 (2012).  Courts must instead define the parcel in a manner that reflects reasonable expectations about the property.  Courts must strive for consistency with the central purpose of the Takings Clause: to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong*, 364 U. S., at 49. Treating the lot in question as a single parcel is legitimate for purposes of this takings inquiry, and this supports the conclusion that no regulatory taking occurred here.

The judgment of the Wisconsin Court of Appeals is affirmed.

*It is so ordered.*

Opinion of the Court

JUSTICE GORSUCH took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–214
_____

JOSEPH P. MURR, ET AL., PETITIONERS *v.*
WISCONSIN, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
WISCONSIN, DISTRICT III

[June 23, 2017]

CHIEF JUSTICE ROBERTS, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

The Murr family owns two adjacent lots along the Lower St. Croix River. Under a local regulation, those two properties may not be "sold or developed as separate lots" because neither contains a sufficiently large area of buildable land. Wis. Admin. Code §NR 118.08(4)(a)(2) (2017). The Court today holds that the regulation does not effect a taking that requires just compensation. This bottom-line conclusion does not trouble me; the majority presents a fair case that the Murrs can still make good use of both lots, and that the ordinance is a commonplace tool to preserve scenic areas, such as the Lower St. Croix River, for the benefit of landowners and the public alike.

Where the majority goes astray, however, is in concluding that the definition of the "private property" at issue in a case such as this turns on an elaborate test looking not only to state and local law, but also to (1) "the physical characteristics of the land," (2) "the prospective value of the regulated land," (3) the "reasonable expectations" of the owner, and (4) "background customs and the whole of our legal tradition." *Ante,* at 11–12. Our decisions have, time and again, declared that the Takings Clause protects private property rights as state law creates and defines them. By securing such *established* property rights, the

Takings Clause protects individuals from being forced to bear the full weight of actions that should be borne by the public at large.  The majority's new, malleable definition of "private property"—adopted solely "for purposes of th[e] takings inquiry," *ante,* at 20—undermines that protection.

I would stick with our traditional approach: State law defines the boundaries of distinct parcels of land, and those boundaries should determine the "private property" at issue in regulatory takings cases.  Whether a regulation effects a taking of that property is a separate question, one in which common ownership of adjacent property may be taken into account.  Because the majority departs from these settled principles, I respectfully dissent.

## I
## A

The Takings Clause places a condition on the government's power to interfere with property rights, instructing that "private property [shall not] be taken for public use, without just compensation."  Textually and logically, this Clause raises three basic questions that individuals, governments, and judges must consider when anticipating or deciding whether the government will have to provide reimbursement for its actions.  The first is what "private property" the government's planned course of conduct will affect.  The second, whether that property has been "taken" for "public use."  And if "private property" has been "taken," the last item of business is to calculate the "just compensation" the owner is due.

Step one—identifying the property interest at stake— requires looking outside the Constitution.  The word "property" in the Takings Clause means "the group of rights inhering in [a] citizen's relation to [a] . . . thing, as the right to possess, use and dispose of it."  *United States* v. *General Motors Corp.*, 323 U. S. 373, 378 (1945).  The Clause does not, however, provide the definition of those

rights in any particular case. Instead, "property interests
. . . are created and their dimensions are defined by exist-
ing rules or understandings that stem from an independ-
ent source such as state law." *Ruckelshaus* v. *Monsanto
Co.*, 467 U. S. 986, 1001 (1984) (alteration and internal
quotation marks omitted). By protecting these established
rights, the Takings Clause stands as a buffer between
property owners and governments, which might naturally
look to put private property to work for the public at large.

When government action interferes with property
rights, the next question becomes whether that interfer-
ence amounts to a "taking." "The paradigmatic taking . . .
is a direct government appropriation or physical invasion
of private property." *Lingle* v. *Chevron U. S. A. Inc.*, 544
U. S. 528, 537 (2005). These types of actions give rise to
"*per se* taking[s]" because they are "perhaps the most
serious form[s] of invasion of an owner's property inter-
ests, depriving the owner of the rights to possess, use and
dispose of the property." *Horne* v. *Department of Agricul-
ture*, 576 U. S. ___, ___ (2015) (slip op., at 7) (internal
quotation marks omitted).

But not all takings are so direct: Governments can
infringe private property interests for public use not only
through appropriations, but through regulations as well.
If compensation were required for one but not the other,
"the natural tendency of human nature" would be to ex-
tend regulations "until at last private property disap-
pears." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393,
415 (1922). Our regulatory takings decisions, then, have
recognized that, "while property may be regulated to a
certain extent, if regulation goes too far it will be recog-
nized as a taking." *Ibid.* This rule strikes a balance be-
tween property owners' rights and the government's au-
thority to advance the common good. Owners can rest
assured that they will be compensated for particularly
onerous regulatory actions, while governments maintain

the freedom to adjust the benefits and burdens of property ownership without incurring crippling costs from each alteration.

Depending, of course, on how far is "too far." We have said often enough that the answer to this question generally resists *per se* rules and rigid formulas. There are, however, a few fixed principles: The inquiry "must be conducted with respect to specific property." *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 495 (1987) (internal quotation marks omitted). And if a "regulation denies all economically beneficial or productive use of land," the interference categorically amounts to a taking. *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1015 (1992). For the vast array of regulations that lack such an extreme effect, a flexible approach is more fitting. The factors to consider are wide ranging, and include the economic impact of the regulation, the owner's investment-backed expectations, and the character of the government action. The ultimate question is whether the government's imposition on a property has forced the owner "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 123 (1978) (internal quotation marks omitted).

Finally, if a taking has occurred, the remaining matter is tabulating the "just compensation" to which the property owner is entitled. "[J]ust compensation normally is to be measured by the market value of the property at the time of the taking." *Horne*, 576 U. S., at ___ (slip op., at 15) (internal quotation marks omitted).

## B

Because a regulation amounts to a taking if it completely destroys a property's productive use, there is an incentive for owners to define the relevant "private property" narrowly. This incentive threatens the careful balance

between property rights and government authority that our regulatory takings doctrine strikes: Put in terms of the familiar "bundle" analogy, each "strand" in the bundle of rights that comes along with owning real property is a distinct property interest. If owners could define the relevant "private property" at issue as the specific "strand" that the challenged regulation affects, they could convert nearly all regulations into *per se* takings.

And so we do not allow it. In *Penn Central Transportation Co.* v. *New York City*, we held that property owners may not "establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest." 438 U. S., at 130. In that case, the owner of Grand Central Terminal in New York City argued that a restriction on the owner's ability to add an office building atop the station amounted to a taking of its air rights. We rejected that narrow definition of the "property" at issue, concluding that the correct unit of analysis was the owner's "rights in the parcel as a whole." *Id.,* at 130–131. "[W]here an owner possesses a full 'bundle' of property rights, the destruction of one strand of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus* v. *Allard*, 444 U. S. 51, 65–66 (1979); see *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 327 (2002).

The question presented in today's case concerns the "parcel as a whole" language from *Penn Central*. This enigmatic phrase has created confusion about how to identify the relevant property in a regulatory takings case when the claimant owns more than one plot of land. Should the impact of the regulation be evaluated with respect to each individual plot, or with respect to adjacent plots grouped together as one unit? According to the majority, a court should answer this question by considering a number of facts about the land and the regulation at issue. The end result turns on whether those factors

"would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Ante,* at 12.

I think the answer is far more straightforward: State laws define the boundaries of distinct units of land, and those boundaries should, in all but the most exceptional circumstances, determine the parcel at issue. Even in regulatory takings cases, the first step of the Takings Clause analysis is still to identify the relevant "private property." States create property rights with respect to particular "things." And in the context of real property, those "things" are horizontally bounded plots of land. *Tahoe-Sierra*, 535 U. S., at 331 ("An interest in real property is defined by the metes and bounds that describe its geographic dimensions"). States may define those plots differently—some using metes and bounds, others using government surveys, recorded plats, or subdivision maps. See 11 D. Thomas, Thompson on Real Property §94.07(s) (2d ed. 2002); Powell on Real Property §81A.05(2)(a) (M. Wolf ed. 2016). But the definition of property draws the basic line between, as P. G. Wodehouse would put it, *meum* and *tuum*. The question of who owns what is pretty important: The rules must provide a readily ascertainable definition of the land to which a particular bundle of rights attaches that does not vary depending upon the purpose at issue. See, *e.g.,* Wis. Stat. §236.28 (2016) ("[T]he lots in [a] plat shall be described by the name of the plat and the lot and block . . . for all purposes, including those of assessment, taxation, devise, descent and conveyance").

Following state property lines is also entirely consistent with *Penn Central.* Requiring consideration of the "parcel as a whole" is a response to the risk that owners will strategically pluck one strand from their bundle of property rights—such as the air rights at issue in *Penn Central*— and claim a complete taking based on that strand alone.

That risk of strategic unbundling is not present when a legally distinct parcel is the basis of the regulatory takings claim. State law defines all of the interests that come along with owning a particular parcel, and both property owners and the government must take those rights as they find them.

The majority envisions that relying on state law will create other opportunities for "gamesmanship" by land-owners and States: The former, it contends, "might seek to alter [lot] lines in anticipation of regulation," while the latter might pass a law that "consolidates . . . property" to avoid a successful takings claim. *Ante,* at 11, 17. But such obvious attempts to alter the legal landscape in anticipation of a lawsuit are unlikely and not particularly difficult to detect and disarm. We rejected the strategic splitting of property rights in *Penn Central*, and courts could do the same if faced with an attempt to create a takings-specific definition of "private property." Cf. *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 167 (1998) ("[A] State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law").

Once the relevant property is identified, the real work begins. To decide whether the regulation at issue amounts to a "taking," courts should focus on the effect of the regulation on the "private property" at issue. Adjacent land under common ownership may be relevant to that inquiry. The owner's possession of such a nearby lot could, for instance, shed light on how the owner reasonably expected to use the parcel at issue before the regulation. If the court concludes that the government's action amounts to a taking, principles of "just compensation" may also allow the owner to recover damages "with regard to a separate parcel" that is contiguous and used in conjunction with the parcel at issue. 4A L. Smith & M. Hansen, Nichols' Law of Eminent Domain, ch. 14B, §14B.02 (rev.

3d ed. 2010).

   In sum, the "parcel as a whole" requirement prevents a property owner from identifying a single "strand" in his bundle of property rights and claiming that interest has been taken. Allowing that strategic approach to defining "private property" would undermine the balance struck by our regulatory takings cases. Instead, state law creates distinct parcels of land and defines the rights that come along with owning those parcels. Those established bundles of rights should define the "private property" in regulatory takings cases. While ownership of contiguous properties may bear on whether a person's plot has been "taken," *Penn Central* provides no basis for disregarding state property lines when identifying the "parcel as a whole."

## II

   The lesson that the majority draws from *Penn Central* is that defining "the proper parcel in regulatory takings cases cannot be solved by any simple test." *Ante,* at 20. Following through on that stand against simplicity, the majority lists a complex set of factors theoretically designed to reveal whether a hypothetical landowner might expect that his property "would be treated as one parcel, or, instead, as separate tracts." *Ante,* at 11. Those factors, says the majority, show that Lots E and F of the Murrs' property constitute a single parcel and that the local ordinance requiring the Murrs to develop and sell those lots as a pair does not constitute a taking.

   In deciding that Lots E and F are a single parcel, the majority focuses on the importance of the ordinance at issue and the extent to which the Murrs may have been especially surprised, or unduly harmed, by the application of that ordinance to their property. But these issues should be considered when deciding if a regulation constitutes a "taking." Cramming them into the definition of

"private property" undermines the effectiveness of the Takings Clause as a check on the government's power to shift the cost of public life onto private individuals.

The problem begins when the majority loses track of the basic structure of claims under the Takings Clause. While it is true that we have referred to regulatory takings claims as involving "essentially ad hoc, factual inquiries," we have conducted those wide-ranging investigations when assessing "the question of what constitutes a '*taking*'" under *Penn Central*. *Ruckelshaus*, 467 U. S., at 1004 (emphasis added); see *Tahoe-Sierra*, 535 U. S., at 326 ("[W]e have generally eschewed any set formula for determining *how far is too far*" (emphasis added; internal quotation marks omitted)). And even then, we reach that "ad hoc" *Penn Central* framework only after determining that the regulation did not deny all productive use of the parcel. See *Tahoe-Sierra*, 535 U. S., at 331. Both of these inquiries presuppose that the relevant "private property" has already been identified. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 295 (1981) (explaining that "[t]hese 'ad hoc, factual inquiries' must be conducted with respect to specific property"). There is a simple reason why the majority does not cite a single instance in which we have made that identification by relying on anything other than state property principles—we have never done so.

In departing from state property principles, the majority authorizes governments to do precisely what we rejected in *Penn Central*: create a litigation-specific definition of "property" designed for a claim under the Takings Clause. Whenever possible, governments in regulatory takings cases will ask courts to aggregate legally distinct properties into one "parcel," solely for purposes of resisting a particular claim. And under the majority's test, identifying the "parcel as a whole" in such cases will turn on the reasonableness of the regulation as applied to the claim-

ant. The result is that the government's regulatory inter-
ests will come into play not once, but twice—first when
identifying the relevant parcel, and again when determin-
ing whether the regulation has placed too great a public
burden on that property.

Regulatory takings, however—by their very nature—pit
the common good against the interests of a few. There is
an inherent imbalance in that clash of interests. The
widespread benefits of a regulation will often appear far
weightier than the isolated losses suffered by individuals.
And looking at the bigger picture, the overall societal good
of an economic system grounded on private property will
appear abstract when cast against a concrete regulatory
problem. In the face of this imbalance, the Takings Clause
"prevents the public from loading upon one individual
more than his just share of the burdens of government,"
*Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 325
(1893), by considering the effect of a regulation on specific
property rights as they are established at state law. But
the majority's approach undermines that protection, defin-
ing property only after engaging in an ad hoc, case-specific
consideration of individual and community interests. The
result is that the government's goals shape the playing
field before the contest over whether the challenged regu-
lation goes "too far" even gets underway.

Suppose, for example, that a person buys two distinct
plots of land—known as Lots A and B—from two different
owners. Lot A is landlocked, but the neighboring Lot B
shares a border with a local beach. It soon comes to light,
however, that the beach is a nesting habitat for a species
of turtle. To protect this species, the state government
passes a regulation preventing any development or recrea-
tion in areas abutting the beach—including Lot B. If that
lot became the subject of a regulatory takings claim, the
purchaser would have a strong case for a *per se* taking:
Even accounting for the owner's possession of the other

property, Lot B had no remaining economic value or productive use.  But under the majority's approach, the government can argue that—based on all the circumstances and the nature of the regulation—Lots A and B should be considered one "parcel."  If that argument succeeds, the owner's *per se* takings claim is gone, and he is left to roll the dice under the *Penn Central* balancing framework, where the court will, for a second time, throw the reasonableness of the government's regulatory action into the balance.

The majority assures that, under its test, "[d]efining the property . . . should not *necessarily* preordain the outcome in *every* case."  *Ante,* at 10 (emphasis added).  The underscored language cheapens the assurance.  The framework laid out today provides little guidance for identifying whether "expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Ante,* at 12.  Instead, the majority's approach will lead to definitions of the "parcel" that have far more to do with the reasonableness of applying the challenged regulation to a particular landowner.  The result is clear double counting to tip the scales in favor of the government: Reasonable government regulation should have been anticipated by the landowner, so the relevant parcel is defined consistent with that regulation.  In deciding whether there is a taking under the second step of the analysis, the regulation will seem eminently reasonable given its impact on the pre-packaged parcel.  Not, as the Court assures us, "necessarily" in "every" case, but surely in most.

Moreover, given its focus on the particular challenged regulation, the majority's approach must mean that two lots might be a single "parcel" for one takings claim, but separate "parcels" for another.  See *ante,* at 13.  This is just another opportunity to gerrymander the definition of

"private property" to defeat a takings claim. The majority also emphasizes that courts trying to identify the relevant parcel "must strive" to ensure that "some people alone [do not] bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Ante,* at 20 (internal quotation marks omitted). But this refrain is the traditional touchstone for spotting a taking, not for defining private property.

Put simply, today's decision knocks the definition of "private property" loose from its foundation on stable state law rules and throws it into the maelstrom of multiple factors that come into play at the second step of the takings analysis. The result: The majority's new framework compromises the Takings Clause as a barrier between individuals and the press of the public interest.

## III

Staying with a state law approach to defining "private property" would make our job in this case fairly easy. The Murr siblings acquired Lot F in 1994 and Lot E a year later. Once the lots fell into common ownership, the challenged ordinance prevented them from being "sold or developed as separate lots" because neither contained a sufficiently large area of buildable land. Wis. Admin. Code §NR 118.08(4)(a)(2). The Murrs argued that the ordinance amounted to a taking of Lot E, but the State of Wisconsin and St. Croix County proposed that both lots together should count as the relevant "parcel."

The trial court sided with the State and County, and the Wisconsin Court of Appeals affirmed. Rather than considering whether Lots E and F are separate parcels under Wisconsin law, however, the Court of Appeals adopted a takings-specific approach to defining the relevant parcel. See 2015 WI App 13, 359 Wis. 2d 675, 859 N. W. 2d 628 (unpublished opinion), App. to Pet. for Cert. A–9, ¶17 (framing the issue as "whether contiguous property is

analytically divisible for purposes of a regulatory takings claim"). Relying on what it called a "well-established rule" for "regulatory takings cases," the court explained "that contiguous property under common ownership is considered as a whole regardless of the number of parcels contained therein." *Id.,* at A–11, ¶20. And because Lots E and F were side by side and owned by the Murrs, the case was straightforward: The two lots were one "parcel" for the regulatory takings analysis. The court therefore evaluated the effect of the ordinance on the two lots considered together.

As I see it, the Wisconsin Court of Appeals was wrong to apply a takings-specific definition of the property at issue. Instead, the court should have asked whether, under general state law principles, Lots E and F are legally distinct parcels of land. I would therefore vacate the judgment below and remand for the court to identify the relevant property using ordinary principles of Wisconsin property law.

After making that state law determination, the next step would be to determine whether the challenged ordinance amounts to a "taking." If Lot E is a legally distinct parcel under state law, the Court of Appeals would have to perform the takings analysis anew, but could still consider many of the issues the majority finds important. The majority, for instance, notes that under the ordinance the Murrs can use Lot E as "recreational space," as the "location of any improvements," and as a valuable addition to Lot F. *Ante,* at 18. These facts could be relevant to whether the "regulation denies all economically beneficial or productive use" of Lot E. *Lucas*, 505 U. S., at 1015. Similarly, the majority touts the benefits of the ordinance and observes that the Murrs had little use for Lot E independent of Lot F and could have predicted that Lot E would be regulated. *Ante,* at 18. These facts speak to "the economic impact of the regulation," interference with

"investment-backed expectations," and the "character of the governmental action"—all things we traditionally consider in the *Penn Central* analysis. 438 U. S., at 124.

I would be careful, however, to confine these considerations to the question whether the regulation constitutes a taking. As Alexander Hamilton explained, "the security of Property" is one of the "great object[s] of government." 1 Records of the Federal Convention of 1787, p. 302 (M. Farrand ed. 1911). The Takings Clause was adopted to ensure such security by protecting property rights as they exist under state law. Deciding whether a regulation has gone so far as to constitute a "taking" of one of those property rights is, properly enough, a fact-intensive task that relies "as much on the exercise of judgment as on the application of logic." *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340, 349 (1986) (alterations and internal quotation marks omitted). But basing the definition of "property" on a judgment call, too, allows the government's interests to warp the private rights that the Takings Clause is supposed to secure.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–214

_____

## JOSEPH P. MURR, ET AL., PETITIONERS *v.* WISCONSIN, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
WISCONSIN, DISTRICT III

[June 23, 2017]

JUSTICE THOMAS, dissenting.

I join THE CHIEF JUSTICE's dissent because it correctly applies this Court's regulatory takings precedents, which no party has asked us to reconsider. The Court, however, has never purported to ground those precedents in the Constitution as it was originally understood. In *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922), the Court announced a "general rule" that "if regulation goes too far it will be recognized as a taking." But we have since observed that, prior to *Mahon*, "it was generally thought that the Takings Clause reached only a 'direct appropriation' of property, *Legal Tender Cases*, 12 Wall. 457, 551 (1871), or the functional equivalent of a 'practical ouster of [the owner's] possession,' *Transportation Co.* v. *Chicago*, 99 U. S. 635, 642 (1879)." *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1014 (1992). In my view, it would be desirable for us to take a fresh look at our regulatory takings jurisprudence, to see whether it can be grounded in the original public meaning of the Takings Clause of the Fifth Amendment or the Privileges or Immunities Clause of the Fourteenth Amendment. See generally Rappaport, Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, but the Fourteenth Amendment May, 45 San Diego L. Rev. 729 (2008) (describing the debate among scholars over those questions).