WORKE, Judge
In this appeal from the district court's dismissal of its declaratory-judgment action challenging a land-use ordinance prohibiting all mining of industrial minerals, including silica sand, appellant argues that the district court erred in concluding that the ordinance does not violate the dormant Commerce Clause and does not constitute a regulatory taking. We affirm.
FACTS
Between 2011 and 2012, Richard Frick, president of appellant Minnesota Sands, LLC (Minnesota Sands), entered into several leases with various landowners in Winona County to use the properties to mine silica sand to be processed and used in hydraulic fracturing for oil and natural gas (fracking). Frick then assigned the leases to Minnesota Sands. At that time, this type of industrial mining was a conditional use requiring a conditional use permit (CUP) prior to excavation. In 2011, respondent Winona County (the county) received three applications for CUPs to engage in industrial mining for silica sand. None of the applications were for the parcels leased by Minnesota Sands.
On January 10, 2012, the county denied the pending applications and enacted a three-month moratorium to allow its board of commissioners to study the issue more closely. After the moratorium expired, a company that is not a party in this litigation, Nisbit operation, submitted a second CUP application to engage in silica-sand mining, which the county granted.
In 2016, a local non-profit asked the county to renew discussions about amending the county's zoning ordinance governing sand mining. The county engaged in an eight-month-long process, during which it investigated the environmental concerns related to industrial mineral operations in particular, and received comments from over 200 county residents through public hearings and written submissions. On November 22, 2016, the county board formally adopted an amendment to the zoning ordinance.
The amendment prohibits all industrial mineral operations within the county and permits construction mineral operations, which remains a conditional use. Winona County, Minn., Zoning Ordinance (WCZO), *778 Ch. 10, § 11 (2016). It defines and distinguishes two groups of minerals:
Construction Minerals: The term "construction minerals" includes natural common rock, stone, aggregate, gravel and sand that is produced and used for local construction purposes, including road pavement, unpaved road gravel or cover, concrete, asphalt, building and dimension stone, railroad ballast, decorative stone, retaining walls, revetment stone, riprap, mortar sand, construction lime, agricultural lime and bedding sand for livestock operations, sewer and septic systems, landfills, and sand blasting. The term "construction minerals" does not include "industrial minerals" as defined below.
Industrial Minerals: The term "industrial minerals" includes naturally existing high quartz level stone, silica sand, quartz, graphite, diamonds, gemstones, kaolin, and other similar materials used in industrial applications, but excluding construction minerals as defined above.
Silica sand is categorized as an industrial mineral by the Minnesota Department of Natural Resources and the North American Classification System under classification no. 212322.
"Silica sand" has the meaning given in Minnesota Statutes, section 116C.99, subd. 1(d) : " 'Silica sand' means well-rounded, sand-sized grains of quartz (silicon dioxide), with very little impurities in terms of other minerals. Specifically, the silica sand for the purposes of this section is commercially valuable for use in the hydraulic fracturing of shale to obtain oil and natural gas. Silica sand does not include common rock, stone, aggregate, gravel, sand with a low quartz level, or silica compounds recovered as a by-product of metallic mining." Minn. Stat. Section 116C.99, subd. 1(d).
Id. , Ch. 4, § 2. Industrial mineral operations include the following activities: (1) acquiring industrial minerals through all digging, excavating, and mining of any sort; (2) processing, filtering, cleaning, and refining industrial minerals; (3) storing or stockpiling said industrial minerals; and (4) hauling or transporting any industrial minerals mined in the county. Id.
Southeast Minnesota Property Owners (SMPO) sued the county in March 2017, alleging that the ordinance is arbitrary and capricious; violates the Due Process, Equal Protection, and Takings Clauses of the Minnesota and United States Constitutions; and violates the Interstate Commerce Clause of the United States Constitution. In April 2017, Minnesota Sands sued and alleged the same.
After the district court consolidated the two actions, Minnesota Sands and SMPO each filed a motion for summary judgment on all claims against the county. Specifically, each requested declaratory and injunctive relief to invalidate the amendment and enjoin its enforcement, as well as summary judgment as to all other claims set forth in the complaints. The county filed a motion to dismiss, or in the alternative, for summary judgment. The district court granted the county's summary judgment motion, affirming the validity of the ordinance. This appeal by Minnesota Sands follows.
ISSUES
I. Does the zoning ordinance violate the dormant Commerce Clause?
II. Is the zoning ordinance a regulatory taking of Minnesota Sands' compensable property interest?
ANALYSIS
Minnesota Sands challenges the district court's grant of summary judgment in favor of the county. On appeal from summary judgment, we determine whether there are any genuine issues of material *779 fact and whether a party is entitled to judgment as a matter of law. Laymon v. Minnesota Premier Properties, LLC , 913 N.W.2d 449, 452 (Minn. 2018). Where the material facts are not in dispute, as in this case, we review the district court's application of the law de novo. Wensmann Realty, Inc. v. City of Eagan , 734 N.W.2d 623, 630 (Minn. 2007).
This appeal presents two issues. The first is whether the county may ban all silica-sand mining within its boundaries without transgressing Congress' authority under the Commerce Clause of the United States Constitution. The second is whether the ordinance prohibiting all silica-sand mining constitutes a regulatory taking of Minnesota Sands' compensable property interest for which it is owed just compensation pursuant to Article I, Section 13 of the Minnesota Constitution and the Takings Clause of the United States Constitution. We address each argument in turn.
I. Dormant Commerce Clause
The Commerce Clause of the United States Constitution grants Congress the power to regulate commerce among the states. U.S. Const. art I, § 8, cl. 3. The Commerce Clause refers to an affirmative grant of power to Congress, but it has long been interpreted to contain an implied negative command, the dormant Commerce Clause, that states may not unduly burden or discriminate against interstate commerce. Chapman v. Comm'r of Revenue , 651 N.W.2d 825, 832 (Minn. 2002). The dormant Commerce Clause "is driven by a concern about 'economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Swanson v. Integrity Advance, LLC , 870 N.W.2d 90, 93 (Minn. 2015) (quoting McBurney v. Young , 569 U.S. 221, 235, 133 S.Ct. 1709, 1719, 185 L.Ed.2d 758 (2013) ).
Our precedent prescribes that we first determine whether the challenged law implicates the Commerce Clause. Chapman , 651 N.W.2d at 832. Congressional Commerce-Clause authority extends to three broad categories of activity: "(1) the use of the channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) activities having a substantial effect on interstate commerce." Id. at 832-33 (citing United States v. Lopez , 514 U.S. 549, 558-59, 115 S.Ct. 1624, 1629-30, 131 L.Ed.2d 626 (1995) ) (noting types of interstate commerce that the dormant Commerce Clause may implicate).
Next, if the challenged law implicates commerce, we evaluate whether the government action violates the Commerce Clause. Id. at 832. This may occur in two ways. Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality , 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994).
First, a law may violate the Commerce Clause by discriminating against interstate commerce, either on its face or in its effect. Oregon Waste Sys., Inc. v. Dep't of Envtl.Quality , 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994) ; Hunt v. Washington State Apple Advertising Comm'n , 432 U.S. 333, 350-51, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977).
Wyoming v. Oklahoma , 502 U.S. 437, 455, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992). Discrimination occurs if a law prescribes "differential treatment of in-state and out-of-state interests that benefits the former and burdens the latter." Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350. A law that discriminates against interstate commerce in its purpose or effect is a virtually per se rule of invalidity subject to "the strictest scrutiny." Id. at 101, 114 S.Ct. at 1351 (quoting *780 Hughes v. Oklahoma , 441 U.S. 322, 337, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979) ).
Second, a law that is non-discriminatory, regulates even-handedly to effectuate a legitimate local purpose, and has only an incidental effect on interstate commerce, may violate the Commerce Clause if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc. , 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). We analyze the Pike balancing test by using "a less strict scrutiny." Wyoming v. Oklahoma , 502 U.S. 437, 455 n.12, 112 S.Ct. 789, 800 n.12, 117 L.Ed.2d 1 (1992).
A. The ordinance does not discriminate against interstate commerce on its face by banning all silica-sand mining.
Minnesota Sands argues that the ordinance is a per se violation of the dormant Commerce Clause because it is facially discriminatory against out-of-state interests and is a ban on the exportation of industrial minerals mined in the county. We disagree.
Assuming that the ordinance implicates commerce, it nonetheless does not discriminate against interstate commerce on its face because it does not favor in-state interests over out-of-state interests. On the contrary, it even-handedly bans all industrial-mineral mining, which includes silica-sand mining, within the county. Indeed, the company challenging the county's ban in this litigation is a Minnesota company with a registered address in Winona County. See Minnesota v. Clover Leaf Creamery Co. , 449 U.S. 456, 473, 101 S.Ct. 715, 728, 66 L.Ed.2d 659 (1981) ("[T]here is no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms. Indeed, two of the three dairies, the sole milk retailer, and the sole milk container producer challenging the statute in this litigation are Minnesota firms.").[1] "The existence of major in-state interests adversely affected by the [ordinance] is a powerful safeguard against legislative abuse." Id. at 473 n.17, 101 S.Ct. at 728 n.17. We have no reason to believe that the ordinance benefits in-state interests and burdens those out-of-state. The across-the-board application of the ordinance is detrimental to both in-state interests, such as those of Minnesota Sands, as well as out-of-state interests, which indicates that the ordinance does not discriminate on its face.
Minnesota Sands also argues that the ordinance is facially discriminatory because it singles out the end-use of the industrial minerals; specifically, silica sand to be processed and used in fracking. In 2014, the Minnesota Environmental Quality Board (EQB) set forth model standards and criteria for local government use in developing local ordinances regarding the mining, processing, and transporting of silica sand. MINN. ENVTL. QUALITY BD. , Tools to Assist Local Governments in Planning for and Regulating Silica Sand Projects (2014). The report noted that "silica sand is highly desirable because it can be processed into a product called frac sand , which is used in [the] hydraulic fracturing method of producing oil and gas." Id. at 13 (emphasis added). It is evident that not all silica sand is frac sand. Rather, mined silica sand becomes frac sand after it undergoes *781 a specific process of crushing, cleaning, screening, washing, filtering, drying, sorting, and refining. But the ordinance outlaws all silica-sand mining-not just silica sand to be processed and used in fracking.
The ordinance amendment defines silica sand as that which "is commercially valuable for use in the hydraulic fracturing of shale to obtain oil and natural gas." WCZO, Ch. 4, § 2. Minnesota Sands argues that this amounts to facial discrimination against interstate commerce because Minnesota has no oil or natural gas reserves, and any silica sand processed into frac sand would be transported interstate and used elsewhere. But the ordinance does not discriminate against interstate commerce on its face by merely stating that silica sand is commercially valuable for use in fracking. Nor does it mean that silica sand has no other commercial uses; it simply describes one commercially valuable use.
This reasoning is consistent with the affidavit of a registered professional geologist retained by Minnesota Sands as an expert, certifying that silica sand may be used for fracking operations, as well as in the manufacture of glass, filter media, and as a construction material or animal bedding. We do note, however, that the expert's comment about the use of silica sand as a construction material does not alter our conclusion that the ordinance does not discriminate against interstate commerce on its face. The use of silica sand as a construction material in other counties has no bearing on the plain language of the ordinance itself, which specifies that silica sand is an industrial mineral and bans all industrial-mineral mining regardless of its end use. Additionally, the ordinance's definition of "construction minerals" specifies that "[t]he term 'construction minerals' does not include 'industrial minerals' as defined below" and the definition of industrial minerals states the same relating to construction minerals. Id.
The ordinance's differentiation between silica sand-an industrial mineral-and other types of sand-construction minerals-is consistent with the record. Silica sand has a high quartz level, whereas sand within the definition of construction minerals includes many different rock types. Silica sand that is sought for industrial purposes is small, consistently-sized, round sand, which, after processing, becomes frac sand. Sand classified as a construction mineral is not dependent on the uniformity or silica quartz makeup of the mineral, and may have mineral and rock compositions that vary in makeup and size.
Minnesota Sands argues that the ordinance violates the dormant Commerce Clause because the county permits the Nisbit operation to mine silica sand that is sold for various purposes, including animal bedding. Before the county amended the ordinance, all sand mining was a conditional use in Winona County. WCZO, Ch. 10.4.6 (2011) (CUP required for mining); Id. , Ch. 4.2 (mining includes "the extraction of sand"). On July 4, 2013, the county granted a CUP to the Nisbits to mine silica sand under this version of the zoning ordinance in effect prior to its amendment on November 22, 2016. The previous version of the ordinance, like the amendment at issue, did not distinguish between the end use of the mined product. In addition, the previous zoning ordinance did not distinguish between silica sand and other types of sand as the amendment does. One limitation imposed on the right of a governmental body to enact zoning restrictions is that such restrictions are subject to the preexisting uses already established within the zoning district. Hawkins v. Talbot , 248 Minn. 549, 551, 80 N.W.2d 863, 865 (1957). Thus, the preexisting use does not affect our dormant Commerce Clause analysis here.
*782 Minnesota Sands contends that the ordinance is discriminatory because "industrial mineral operations" includes "hauling or transport, including, but not limited to, the loading, unloading, transfer, hauling, moving and transporting of industrial minerals extracted from a mine located in Winona County." WCZO, Ch. 4, § 2. But this provision of the amendment's definition of "industrial mineral operations" is rendered superfluous by the corresponding provision of the "industrial mineral operations" definition that prohibits all silica-sand mining. We interpret laws so that, when possible, their provisions will not be deemed superfluous. ILHC of Eagan, LLC v. County of Dakota , 693 N.W.2d 412, 419 (Minn. 2005). However, the transportation provision at issue cannot reasonably be interpreted as anything other than superfluous, given the ban on all silica-sand mining, resulting in no silica sand in need of transport to which the provision may apply.[2]
For these reasons, the ordinance's ban on silica-sand mining does not discriminate against interstate commerce on its face. It is even-handed in its application, burdens both in-state and out-of-state interests, and does not violate the dormant Commerce Clause.[3]
B. Minnesota Sands does not have standing to challenge, and we decline to address, the constitutionality of the ordinance's use of the word "local."
Minnesota Sands also argues that the use of the word "local" in the ordinance's definition of "construction minerals" discriminates against interstate commerce. While the parties do not raise the issue of justiciability on appeal, "the existence of a justiciable controversy is essential to our exercise of jurisdiction, so we can raise the issue on our own." In re Guardianship of Tschumy , 853 N.W.2d 728, 733-34 (Minn. 2014). A declaratory judgment action must present an actual, justiciable controversy. Onvoy, Inc. v. ALLETE, Inc. , 736 N.W.2d 611, 617 (Minn. 2007). "To establish a justiciable controversy in a declaratory judgment action challenging the constitutionality of a law, a plaintiff must show a direct and imminent injury which results from the alleged unconstitutional provision." McCaughtry v. City of Red Wing , 808 N.W.2d 331, 337 (Minn. 2011) (quotation omitted); see Lee v. Delmont , 228 Minn. 101, 110-11, 36 N.W.2d 530, 537 (1949) (litigant challenging constitutionality of a statute must show that the statute "is, or is about to be, applied to his disadvantage").
Minnesota Sands itself contends that it has no interest in mining construction minerals. Striking down this provision of the ordinance will not redress its asserted injuries because industrial-mineral mining will continue to be unlawful and the zoning ordinance amendment will continue to prohibit Minnesota Sands from mining industrial minerals. See generally Back v. State , 902 N.W.2d 23, 31 (Minn. 2017) (severing of as little as possible of an unconstitutional law).
*783 Minnesota Sands does not have standing, which bars us from addressing this issue for lack of jurisdiction. See Seiz v. Citizens Pure Ice Co. , 207 Minn. 277, 281, 290 N.W. 802, 804 (1940). And we do not address constitutional claims unless required. See Brayton v. Pawlenty , 781 N.W.2d 357, 363 (Minn. 2010). To do so would be to issue an advisory opinion. North Carolina v. Rice , 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (advisory opinion calls the court "to decide questions that cannot affect the rights of litigants in the case before them"). We therefore decline to address this argument.
C. We also decline to address whether the ordinance excessively burdens interstate commerce because Minnesota Sands did not make this argument in its briefing.
An ordinance that is even-handed in its application may nonetheless violate the dormant Commerce Clause by excessively burdening interstate commerce. See generally Pike , 397 U.S. at 142, 90 S.Ct. at 847. Although Minnesota Sands raised this issue during oral argument, it did not brief it. We decline to address this argument, which, absent briefing on appeal, is forfeited and not properly before this court. Wintz , 558 N.W.2d at 480.
II. Regulatory Taking
Minnesota Sands also argues that it is entitled to compensation because the zoning ordinance amendment is a regulatory taking of its property. We are not persuaded.
The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation." Minn. Const. art. I, § 13. The language in the Takings Clause of the Minnesota Constitution is similar to the language of the United States Constitution. Wensmann , 734 N.W.2d at 631. Appellate courts may rely on cases interpreting the Takings Clause of the United States Constitution in interpreting this clause of the Minnesota Constitution. Id. at 631-32. However, property interests themselves are not created by the United States Constitution and instead are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Ruckelshaus v. Monsanto Co. , 467 U.S. 986, 1001, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984) ; see also Hay v. City of Andover , 436 N.W.2d 800, 804 (Minn.App. 1989). Whether a governmental entity's action constitutes a taking is a question of law that we review de novo. Wensmann , 734 N.W.2d at 631.
Prior to analyzing whether the zoning ordinance amendment constituted a regulatory taking of the mineral interest in the parcels of real property, we must determine whether Minnesota Sands has a compensable property interest for which it is owed just compensation. Hall v. State , 908 N.W.2d 345, 352 (Minn. 2018) (citing Ruckelshaus , 467 U.S. at 1000, 104 S.Ct. at 2871-72 (analyzing compensable property interest issue as applied to regulatory scheme) ); Metropolitan Airports Comm'n v. Noble , 763 N.W.2d 639, 644 (Minn. 2009) (aggrieved party must have a compensable interest in property to assert valid claim for taking of leasehold interest). Thus, we must analyze whether Minnesota Sands possesses the predicate property interest that must underlie any takings claim; specifically, whether Minnesota Sands' leases created a compensable property interest to which Minnesota Sands is owed just compensation.
Lease rights are compensable property rights to which the Takings Clause applies. See Lynch v. United States , 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) ("The Fifth Amendment commands that property not *784 be taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."). Of the six leases that Minnesota Sands entered into, four were specifically conditioned upon Minnesota Sands obtaining any required zoning or governmental approvals on or before the commencement date of each agreement, in November 2011. Minnesota Sands never applied for a CUP prior to the county's amendment of the zoning ordinance.
Minnesota Sands failed to fulfill a condition precedent before its leasehold interest accrued. See Carl Bolander & Sons Co. v. United Stockyards Corp. , 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974) (condition precedent is an act that must be performed or an event that must occur before a contractual right accrues or contractual duty arises). And Minnesota Sands explicably agreed in advance to such a term. See Metropolitan Airports Comm'n v. Noble , 763 N.W.2d 639, 644 (Minn. 2009) (interest in real property created by lease may be altered by lease's terms). Minnesota Sands is not entitled to just compensation because the mineral interest in the real property for which it seeks compensation, created by the leases, required the acquisition of a CUP prior to the accrual of a compensable property interest.
Minnesota Sands entered into its remaining leases in November 2011 and amended each lease in November 2015. The county amended the zoning ordinance one year later, in November 2016. Prior to its amendment, silica-sand mining was a conditional use. Minnesota Sands lost its leasehold interests because it failed to apply for a CUP in the five-year period between the lease executions and the amendment of the zoning ordinance.[4] Regulation of private property rights does not take private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he or she complies with the regulatory restrictions imposed. U.S. v. Locke , 471 U.S. 84, 107, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1985) ; see Texaco, Inc. v. Short , 454 U.S. 516, 530, 102 S.Ct. 781, 792, 70 L.Ed.2d 738 (1982) (no compensation due to "the owner for the consequences of his own neglect"); Hawkins v. Barney's Lessee , 30 U.S. 457, 465, 5 Pet. 457, 8 L.Ed. 190 (1831) ("What right has any one to complain, when a reasonable time has been given to him, if he has not been vigilant in asserting his rights?"). Minnesota Sands has no compensable property interest, which ends our analysis.
DECISION
The county's zoning ordinance amendment does not violate the dormant Commerce Clause because it even-handedly bans both in-state and out-of-state interests from mining all silica sand in Winona County. In addition, Minnesota Sands does not have a compensable property interest for which it is owed just compensation. We affirm the district court's grant of summary judgment to respondent Winona County because there are no genuine issues of material fact and the district court did not err in its application of the law.
Affirmed.
Concurring in part, dissenting in part, Johnson, Judge
JOHNSON, Judge (concurring in part, dissenting in part)
*785 The first issue in this appeal is whether a ban on the mining of silica sand for sale to consumers in other states may be imposed by a state or a political subdivision of a state or, on the other hand, only by Congress. I respectfully disagree with the majority opinion insofar as it concludes that the county is entitled to summary judgment on Minnesota Sands's claim that the November 22, 2016, amendments to the county's zoning ordinance violate the Commerce Clause of the United States Constitution.
The second issue in this appeal is whether, assuming the county's regulation of silica-sand mining is valid, the county must compensate Minnesota Sands for the elimination of or diminution in the value of its property. I respectfully disagree with the majority opinion insofar as it concludes that the county is entitled to summary judgment on Minnesota Sands's claim that the county's enforcement of its zoning ordinance results in a partial regulatory taking. But I agree with the majority insofar as it concludes that Minnesota Sands cannot prove a total regulatory taking, although I reach that conclusion for different reasons.
Therefore, I concur in part and dissent in part.
I.
The Commerce Clause of the United States Constitution provides, "The Congress shall have Power ... To regulate Commerce ... among the several States...." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause confers on Congress "plenary authority over interstate commerce." Oregon Waste Sys., Inc. v. Department of Envtl. Quality , 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). In light of Congress's plenary authority over interstate commerce, the Commerce Clause has been interpreted "to have a 'negative' aspect" that limits the states' authority to regulate interstate commerce. Id. Those limits are defined by "two primary principles": "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." South Dakota v. Wayfair, Inc. , --- U.S. ----, 138 S.Ct. 2080, 2090-91, 201 L.Ed.2d 403 (2018).[1]
Accordingly, "the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it [either] 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.' " Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350 (quoting *786 Hughes v. Oklahoma , 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) ); see also Swanson v. Integrity Advance, LLC , 870 N.W.2d 90, 93-94 (Minn. 2015). A state law is "discriminatory" for purposes of the Commerce Clause if it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350 ; see also Integrity Advance , 870 N.W.2d at 93-94 ; Chapman v. Commissioner of Revenue , 651 N.W.2d 825, 834 (Minn. 2002). If a state law is discriminatory, "it is virtually per se invalid." Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350 ; see also Chapman , 651 N.W.2d at 834. A discriminatory state law "must be invalidated unless [the state] can 'show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' " Oregon Waste Sys. , 511 U.S. at 100-01, 114 S.Ct. at 1351 (alteration omitted) (quoting New Energy Co. v. Limbach , 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988) ); see also Chapman , 651 N.W.2d at 834.
A.
Before applying these principles to the facts of this case, it is important to identify the significant factual issues.
The county's arguments generally are based on the premise that silica sand (and only silica sand) is used for "industrial" purposes such as hydraulic fracturing and that ordinary sand (and only ordinary sand) is used for "local construction purposes." This premise corresponds to the county's zoning ordinance, which defines "industrial minerals" and "construction minerals" accordingly and imposes different consequences based on the distinction between the two types.
The appellate record confirms that silica sand (and not ordinary sand) may be used in hydraulic fracturing. But the record does not confirm that only ordinary sand is used for "local construction purposes." Rather, the record indicates that, both before and after the 2016 amendments to the zoning ordinance, silica sand has been and continues to be used for both "local construction purposes" and "industrial" purposes.
For example, a report prepared by the state department of natural resources in 2014 describes the uses of silica sand:
Silica sand has been mined in the Upper Midwest for over a century. Uses for this resource include a variety of products and applications like glass-making, abrasives, bedding for livestock, golf course sand traps , and frac sand. Over the past decade, a sharp increase in demand for silica sand corresponded with a rapid expansion of shale oil and gas development. ...
Silica sand is found in the southeastern portion of the state. Five mines are currently known to extract silica sand for industrial applications. An unknown number of silica sand mines produce silica sand for construction and agricultural uses.
(Emphasis added.)
In addition, evidence was presented to the county planning commission that "there is no geological difference between the industrial mineral 'silica sand' and construction mineral 'sand' " and that "the only distinction in the Proposed Ordinance between 'construction minerals' and 'industrial minerals' is how they are used." There also is evidence that the "mining, processing, storage and transportation operations" related to the two categories of minerals in the draft ordinance "are essentially the same," with the differences limited to "the final stages of production when silica sand is washed and sorted." This evidence is consistent with an affidavit of a registered professional geologist, who stated *787 that silica sand is used both "as a proppant in hydraulic fracturing" and "in the manufacture of glass, filter media, or a construction or bedding material" and that the process of mining silica sand for its various purposes "does not differ in any material way."
Furthermore, the county's own zoning administrator executed an affidavit in which he stated that " 'sand and gravel' considered [by the zoning ordinance as] a construction mineral may include 'silica sand,' as silica sand is found throughout the County and used for construction purposes and animal bedding." Moreover, there is evidence in the record that the Nisbit mine (the only Winona County mine that received a conditional-use permit before the 2016 amendments to the county's zoning ordinance) produces silica sand that meets the specifications for hydraulic fracturing but is sold for use as animal bedding.
In analyzing the effect of the county's zoning ordinance on interstate commerce, this court should not confine its review to the language of the ordinance. Rather, we should consider the realities of the marketplace. In reality, Winona County silica sand is used both for "local construction purposes" and for "industrial" purposes, such as hydraulic fracturing, even though the county's zoning ordinance deems silica sand to be an "industrial mineral" and defines "industrial minerals" to be mutually exclusive with "construction minerals." Consequently, the county's zoning ordinance effectively allows the mining of silica sand for some uses, which are common in the Winona County area, but prohibits the mining of silica sand for other uses, which occur solely outside the state of Minnesota.
In resolving the issues raised by the parties' arguments, we must be mindful of the procedural posture of the case. This is not a case in which the district court conducted a trial, resolved factual disputes arising from conflicting evidence, and made findings of fact. See Minn. R. Civ. P. 52.01. Rather, the district court decided the case on cross-motions for summary judgment. A district court may not grant a motion for summary judgment unless "there is no genuine issue as to any material fact." Minn. R. Civ. P. 56.03 (2017). A district court must view the evidence in the light most favorable to the non-moving party. Commerce Bank v. West Bend Mut. Ins. Co. , 870 N.W.2d 770, 773 (Minn. 2015). In applying a de novo standard of review, this court also must view the evidence in the light most favorable to the non-moving party. See id. Accordingly, the district court's decision may be affirmed only if "there is no genuine issue as to any material fact" and the county "is entitled to a judgment as a matter of law." See Minn. R. Civ. P. 56.03 (2017).
B.
As stated above, "the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.' " Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350 (quoting Hughes , 441 U.S. at 336, 99 S.Ct. at 1736 ).
1.
Minnesota Sands contends that the county's zoning ordinance is discriminatory. In this context, a state law is "discriminatory" if it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Id. For example, a state law is discriminatory if it prohibits or restricts the transportation of the state's natural resources to consumers in other states. In *788 West v. Kansas Natural Gas Company , 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), an Oklahoma statute prohibited the construction of pipelines for the purpose of transporting natural gas from that state to other states. Id. at 239 n.1, 31 S.Ct. at 565 n.†. The Supreme Court concluded that the statute violated the Commerce Clause, stating that, "in matters of ... interstate commerce there are no state lines." Id. at 255, 31 S.Ct. at 571 (quotation omitted).
A state law is discriminatory on its face if it expressly provides for different treatment based on whether commerce is interstate or intrastate. For example, in Oregon Waste Systems , an Oregon statute charged $0.85 per ton for the disposal of solid waste and a "surcharge" of $2.25 per ton for the disposal of "solid waste generated out-of-state ." 511 U.S. at 96, 114 S.Ct. at 1348 (emphasis added). The Supreme Court reasoned that it was "obvious here that Oregon's $2.25 per ton surcharge is discriminatory on its face." Id. at 99, 114 S.Ct. at 1350. Similarly, in Hughes , an Oklahoma statute made it unlawful for a person to "transport or ship minnows for sale outside the state " in which they were captured. 441 U.S. at 323, 99 S.Ct. at 1730 (emphasis added). The Supreme Court reasoned that the statute "on its face discriminates against interstate commerce" because it "forbids the transportation of natural minnows out of the State for purposes of sale, and thus 'overtly blocks the flow of interstate commerce at [the] State's borders.' " Id. at 336-37, 99 S.Ct. at 1736-37 (alteration in original) (quoting Philadelphia v. New Jersey , 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978) ).
A state law may be facially discriminatory for purposes of the Commerce Clause, even if it does not expressly distinguish between interstate commerce and intrastate commerce, if the circumstances make clear that the law discriminates against interstate commerce. For example, in Bacchus Imports, Ltd. v. Dias , 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), a Hawaii statute imposed a 20-percent excise tax on the sale of wholesale liquor but exempted two types of liquor that were unquestionably local in character (okolehao, "a brandy distilled from the root of ... an indigenous shrub," and fruit wine made from pineapples). Id. at 265, 104 S.Ct. at 3052. The Supreme Court stated that the exemption "seems clearly to discriminate on its face against interstate commerce by bestowing a commercial advantage on okolehao and pineapple wine." Id. at 268, 104 S.Ct. at 3053.
Furthermore, a state law may discriminate against interstate commerce "either on its face or in practical effect ." Hughes , 441 U.S. at 336, 99 S.Ct. at 1736 (emphasis added). A state law may discriminate "in practical effect" even if it is facially neutral with respect to whether commerce is interstate or intrastate. For example, in Hunt v. Washington State Apple Advertising Commission , 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), North Carolina law provided that apples sold within the state in closed containers must display a grade or standard approved by the federal government and must not display any other grade or standard, including a grade or standard approved by a state. Id. at 337 n.2, 339, 97 S.Ct. at 2438 n.2, 2439. The stated purpose of North Carolina law was to avoid consumer confusion by ensuring "a single uniform standard." Id. at 349, 97 S.Ct. at 2444. The state contended that its laws were not discriminatory because they applied "in an evenhanded manner ... to all apples sold in closed containers in the State without regard to their point of origin." Id. But the record showed that apples sold in North Carolina were grown in 13 other states and that 7 of those 13 states "had their own grading systems," which differed in their standards and descriptions. Id. The Supreme Court reasoned *789 that North Carolina law had "the practical effect of ... discriminating against" apple growers from the state of Washington by increasing their costs of doing business in North Carolina "while leaving those of their North Carolina counterparts unaffected." Id. at 351, 97 S.Ct. at 2445 (emphasis added).
In this case, the ordinance and the factual record, in combination, make clear that the county's zoning ordinance is both facially discriminatory and discriminatory in practical effect. The ordinance allows the mining of sand that will be "used for local construction purposes" but prohibits the mining of sand that will be used for other purposes, such as hydraulic fracturing. Winona County, Minn., Zoning Ordinance (WCZO) §§ 4.2, 9.10.2, 10.11.1.a (2016) (emphasis added). The record reveals that silica sand has been and continues to be mined and sold to consumers for purposes that are deemed by the ordinance to be "local construction purposes." The record also reveals that hydraulic fracturing is utilized in other states (such as North Dakota and Texas) but is not utilized in Minnesota and cannot be utilized in Minnesota because Minnesota does not have any significant reserves of oil or natural gas. The ordinance effectively allows silica sand to be mined and sold to local consumers but does not allow it to be mined and sold to consumers in other states. Thus, the ordinance suppresses interstate commerce, to the detriment of (among others) consumers of silica sand in other states, but the ordinance preserves local commerce, to the benefit of local consumers of silica sand, who are insulated from the effects of unrestricted trade in silica sand. For these reasons, the ordinance is discriminatory on its face because it favors "local" commerce over interstate commerce. See Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350 ; Hughes , 441 U.S. at 336-37, 99 S.Ct. at 1736-37. Even if the ordinance did not use the word "local," it still would be facially discriminatory because, given the obvious fact that hydraulic fracturing is not conducted in Minnesota, the ordinance favors intrastate commerce over interstate commerce. See Bacchus Imports , 468 U.S. at 268, 104 S.Ct. at 3053. Furthermore, even if the ordinance is not facially discriminatory, it has "the practical effect of ... discriminating against" consumers of silica sand in other states "while leaving [their intrastate] counterparts unaffected." See Washington State Apple Advertising Comm'n , 432 U.S. at 351, 97 S.Ct. at 2445.[2]
2.
The county argues that the ordinance is not facially discriminatory because the term "local" may be interpreted to include construction projects in Wisconsin that are near Winona County. For this purpose, the county relies on the affidavit of its zoning administrator, who stated, "If I were asked to enforce the Zoning Ordinance with respect to sand being used for a construction project across the river in Wisconsin, the fact that sand was used in Wisconsin would not necessarily make it a non-local use." This argument fails for at least four reasons. First, the county's argument is inconsistent with the common definition of the word local, which means "[o]f or relating to a city, town, or district rather than a larger area." The American Heritage Dictionary 1029 (5th ed. 2011). Second, there is no evidence in the record that Winona County sand actually is sold *790 in Wisconsin. The zoning administrator did not say so; he considered it to be a hypothetical. It appears unlikely that sand actually is sold in Wisconsin because the record indicates that operating sand mines are far more numerous in the Wisconsin counties that are immediately across the Mississippi River. Third, the zoning administrator did not commit to the interpretation on which the county relies in its brief. He merely stated that the out-of-state location of such use "would not necessarily make it a non-local use." Fourth, and most importantly, any sale of Winona County sand in Wisconsin for "local construction purposes" likely would be in relatively small quantities and would not alter the fact that the ordinance disrupts a substantial amount of interstate commerce in silica sand while preserving commerce in silica sand within Winona County. In any event, even if the ordinance is not facially discriminatory because of the word "local," it is discriminatory "in practical effect." See Washington State Apple Advertising Comm'n , 432 U.S. at 351, 97 S.Ct. at 2445.
The majority opinion reasons that Minnesota Sands does not have standing to argue that the ordinance is facially discriminatory based on the ordinance's use of the word "local." See supra at 782-83. "Standing is a legal requirement that a party have a sufficient stake in a justiciable controversy to seek relief from a court." Enright v. Lehmann , 735 N.W.2d 326, 329 (Minn. 2007). Standing exists if the person seeking relief "has suffered some 'injury-in-fact.' " Id. Minnesota Sands plainly has suffered a financial injury by being prohibited from mining silica sand and selling it in interstate commerce. But again, the use of the word "local" is not the sole reason why the county's zoning ordinance is discriminatory; it also is discriminatory "in practical effect." See Washington State Apple Advertising Comm'n , 432 U.S. at 351, 97 S.Ct. at 2445.
The majority opinion also reasons that the ordinance is not discriminatory simply because Minnesota Sands is a Minnesota-based company. See supra at 780. Such reasoning would nullify the dormant Commerce Clause doctrine in practically every case because a state or local law that discriminates against interstate commerce inevitably affects at least one resident of the state or locale from which the law originates. In addition, the majority's reasoning is contrary to Oregon Waste Systems , in which an Oregon-based company successfully challenged an Oregon statute that discriminated against interstate commerce. See 511 U.S. at 95-98, 114 S.Ct. at 1348-49. Furthermore, the authority cited by the majority opinion does not support its reasoning. In Minnesota v. Clover Leaf Creamery Co. , 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), the Supreme Court first determined that the statute at issue was not discriminatory, id. at 471-72, 101 S.Ct. at 728, and then considered the alternative ground for a Commerce Clause violation, namely, "whether the incidental burden imposed on interstate commerce by the Minnesota Act is 'clearly excessive in relation to the putative local benefits,' " id. at 472, 101 S.Ct. at 728 (quoting Pike v. Bruce Church, Inc. , 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) ). In discussing the latter issue, the Supreme Court balanced the various advantages and disadvantages that in-state businesses and out-of-state businesses likely would experience. Id. at 472-74, 101 S.Ct. at 728-29. The majority opinion relies on the Supreme Court's discussion of incidental burdens, not its discussion of discrimination. Because Minnesota Sands does not argue that the county's zoning ordinance imposes incidental burdens that exceed its local benefits, the Pike test does not apply, and the cited portion of Clover Leaf Creamery is not relevant.
*791 C.
As stated above, if a state law is discriminatory, "it is virtually per se invalid." Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350. A discriminatory state law "must be invalidated unless [the state] can 'show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' " Id. at 100-01, 114 S.Ct. at 1351 (alteration omitted) (quoting New Energy Co. , 486 U.S. at 278, 108 S.Ct. at 1810 ). A state's "justifications for discriminatory restrictions on commerce [must] pass the 'strictest scrutiny.' " Id. at 101, 114 S.Ct. at 1351 (quoting Hughes , 441 U.S. at 337, 99 S.Ct. at 1737 ).
In this case, the county's zoning ordinance is motivated by concerns about public health, local infrastructure, and the environment. On appeal, Minnesota Sands does not challenge the legitimacy of the county's purposes. Rather, Minnesota Sands contends that the county could have achieved its purposes with "reasonable regulations directly targeted at" the county's concerns. Accordingly, the question is whether the county has shown that its "legitimate local purpose ... cannot be adequately served by reasonable nondiscriminatory alternatives." See id. at 100-01, 114 S.Ct. at 1351 (quotation omitted).
The county does not attempt to argue that its purposes cannot be adequately served by reasonable non-discriminatory alternatives. The county would be hard-pressed to make such an argument because alternatives are readily apparent in the record. For example, the March 2014 report of the state environmental quality board contains an extensive list of recommendations, standards, and criteria for the regulation of silica-sand mining with respect to air quality, water quality, transportation, reclamation, and numerous other issues.
The record also contains a March 2016 memorandum from the county attorney to the county board, the county planning commission, and others, in which the county attorney concluded that "Winona County has the authority and ability to regulate the size of sand-mining operations" and that "the county board not only has the ability to deny conditional-use permits that do not meet the criteria for issuance, but also has the ability to impose conditions on such permits that address the issues a particular proposal raises."
The record also contains an October 2016 memorandum from the county attorney to the county board in which the county attorney provided the board with four options. The second option would have limited the number of mines and the acreage of each mine, which was the recommendation of the county's planning commission. The third option was a "hybrid" of the planning commission's recommendation and certain recommendations of the county attorney. The fourth option was to "take no action" and to continue to rely on conditional-use permits. The record provides details concerning the fourth option: the conditional-use permit that was issued for the Nisbit mine includes numerous provisions to reduce and limit the effects of sand mining. The permit, among other things, requires an erosion-control plan, limits the hours of operation, requires setbacks from residences and wells, requires air-quality and water-quality monitoring, requires a fugitive-dust plan, prohibits stockpiles higher than 24 feet, prohibits any effect on wetlands, restricts noise and lighting levels, requires a road-use agreement that imposes responsibility on the mine for maintenance and replacement costs, limits truck traffic to a certain number of trips per day, requires a "systematic approach to land reclamation," and requires a performance bond of 110 percent of the estimated *792 costs that might be borne by the mine.
The United States Supreme Court considered an analogous situation in Chemical Waste Management, Inc. v. Hunt , 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992), in which a discriminatory Alabama statute imposed a fee on all hazardous waste disposed of in the state and an "additional fee" on hazardous waste and substances that were "generated outside of Alabama." Id. at 338-39, 112 S.Ct. at 2012 (quotation omitted). In determining whether the state's purposes could be adequately served by reasonable non-discriminatory alternatives, the Supreme Court reasoned as follows:
Ultimately, the State's concern focuses on the volume of the waste entering the [hazardous-waste] facility. Less discriminatory alternatives, however, are available to alleviate this concern, not the least of which are a generally applicable per-ton additional fee on all hazardous waste disposed of within Alabama, or a per-mile tax on all vehicles transporting hazardous waste across Alabama roads, or an evenhanded cap on the total tonnage landfilled at [the facility]. To the extent Alabama's concern touches environmental conservation and the health and safety of its citizens, such concern does not vary with the point of origin of the waste, and it remains within the State's power to monitor and regulate more closely the transportation and disposal of all hazardous waste within its borders. Even with the possible future financial and environmental risks to be borne by Alabama, such risks likewise do not vary with the waste's State of origin in a way allowing foreign, but not local, waste to be burdened. In sum, we find the additional fee to be an obvious effort to saddle those outside the State with most of the burden of slowing the flow of waste into the ... facility. That legislative effort is clearly impermissible under the Commerce Clause of the Constitution.
Id. at 344-46, 112 S. Ct. at 2015-16 (quotations and citations omitted). Just as Alabama's concern for "environmental conservation and the health and safety of its citizens" did "not vary with the point of origin of the waste," Winona County's concerns also do not vary with the destination of the silica sand that is mined within the county. See id. ; see also Hughes , 441 U.S. at 337-38, 99 S.Ct. at 1737 (discussing availability of nondiscriminatory alternatives). Given that a state's justifications for a discriminatory restriction on interstate commerce are subject to "the strictest scrutiny," Oregon Waste Sys. , 511 U.S. at 101, 114 S.Ct. at 1351 (quotation omitted), Winona County has not demonstrated that it does not have reasonable alternatives that would adequately serve its purposes of protecting public health and the environment.
Therefore, I would conclude that the district court erred by granting the county's motion for summary judgment on Minnesota Sands's claim that the county's zoning ordinance violates the dormant Commerce Clause.
II.
The Takings Clause of the Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause requires just compensation if a state or political subdivision regulates the use of real property to such an extent that the regulation effectively is a taking. See generally Murr v. Wisconsin , --- U.S. ----, 137 S.Ct. 1933, 198 L.Ed.2d 497 (2017) ; Keystone Bituminous Coal Ass'n v. DeBenedictis , 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) ;
*793 Pennsylvania Coal Co. v. Mahon , 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).
The United States Supreme Court has recognized two types of regulatory takings. First, a total (or categorical) regulatory taking may occur if a land-use regulation "denies all economically beneficial or productive use of [the] land" and thereby results in the "complete elimination of value" to the property. Lucas v. South Carolina Coastal Council , 505 U.S. 1003, 1015, 1019 n.8, 112 S.Ct. 2886, 2893, 2895 n.8, 120 L.Ed.2d 798 (1992). If a total taking has occurred, just compensation is owed to the property owner "without case-specific inquiry into the public interest advanced in support of the restraint." Id. at 1015, 112 S.Ct. at 2893 ; see also Murr , 137 S.Ct. at 1942-43.
Second, a partial regulatory taking may occur if a land-use regulation "goes too far." Mahon , 260 U.S. at 415, 43 S.Ct. at 160. The Supreme Court has not adopted a "set formula" to determine when a regulatory action has gone "too far." Wensmann Realty, Inc. v. City of Eagan , 734 N.W.2d 623, 632-34 (Minn. 2007). A land-use regulation may be a partial regulatory taking if it "denies an owner economically viable use of his land." Keystone Bituminous Coal Ass'n , 480 U.S. at 485, 107 S.Ct. at 1241-42 (quotation omitted) (reviewing regulation of underground coal mining); see also United States v. Central Eureka Mining Co. , 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958) (reviewing regulation of gold mining); Goldblatt v. Town of Hempstead , 369 U.S. 590, 593-94, 82 S.Ct. 987, 989-90, 8 L.Ed.2d 130 (1962) (reviewing regulation of sand and gravel mining). Courts must engage in "essentially ad hoc, factual inquires" to determine "whether a particular restriction will be rendered invalid" as a regulatory taking. Penn Central Transp. Co. v. New York , 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The analysis "depends largely upon the particular circumstances in that case," id. (quotation and alteration omitted), and is a "highly fact-specific" examination, Wensmann Realty , 734 N.W.2d at 632. Whether a partial taking has occurred depends on three factors: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) the "character of the governmental action." Penn Central , 438 U.S. at 124, 98 S.Ct. at 2659.
A partial regulatory taking also may be established under the Minnesota Constitution, which contains a similar but somewhat broader takings clause: "Private property shall not be taken, destroyed or damaged for public use without just compensation." Minn. Const. art. I, § 13 (emphasis added). According to the Minnesota Statutes, a "taking" includes "every interference, under the power of eminent domain, with the possession, enjoyment, or value of private property." Minn. Stat. § 117.025, subd. 2 (2016). Accordingly, the Minnesota Supreme Court has recognized that "the clear intent of Minnesota law is to fully compensate its citizens for losses related to property rights incurred because of state actions." State by Humphrey v. Strom , 493 N.W.2d 554, 558 (Minn. 1992). The supreme court sometimes has applied the three-part Penn Central test to determine whether a partial regulatory taking has occurred under the Minnesota Constitution. See Wensmann Realty , 734 N.W.2d at 633 (citing cases). But the supreme court also has found a partial regulatory taking under state law even though there was no partial regulatory taking under federal law. See, e.g. , Johnson v. City of Minneapolis , 667 N.W.2d 109, 115-16 (Minn. 2003) ; see also DeCook v. Rochester Int'l Airport Joint Zoning Bd. , 796 N.W.2d 299, 305-06 (Minn. 2011).
*794 In this case, both Minnesota Sands and the county sought summary judgment on both types of regulatory takings claims. The district court rejected Minnesota Sands's regulatory takings claims for two reasons.
A.
The district court's first reason for rejecting Minnesota Sands's regulatory takings claims is that Minnesota Sands did not "ever possess[ ] any right to engage in industrial mineral mining" because it had not obtained a conditional-use permit. The district court based this reasoning on the premise that, "for a party to allege a taking, there must first be a previously existing right to engage in the restricted activity" and that if "no existing right to perform an activity ever existed, there is no taking." As legal authority for this reasoning, the district court cited the supreme court's Wensmann Realty opinion.
The district court misread the Wensmann Realty opinion. The portion of the Wensmann Realty opinion that was cited by the district court is concerned only with the first factor of the Penn Central test, "[t]he economic impact of the regulation on the claimant." Wensmann Realty , 734 N.W.2d at 635 (citing Penn Central , 438 U.S. at 124, 98 S.Ct. at 2659 ). In that portion of the Wensmann Realty opinion, the supreme court discussed various methods by which it might measure the financial impact on the property owner in that case. Wensmann Realty , 734 N.W.2d at 634-37. The supreme court did not state that a pre-existing right to engage in a regulated activity is a prerequisite of a takings claim. See id. In fact, the property owner in Wensmann Realty was prohibited by the city's comprehensive plan from developing its property, but the supreme court ruled in the property owner's favor by reversing a grant of summary judgment and remanding to the district court for further proceedings. See id. at 628-29, 641-42.
State law concerning property rights may be relevant in a regulatory takings case to the extent that "background principles of the State's law of property and nuisance already place [restrictions] upon land ownership." Lucas , 505 U.S. at 1029, 112 S.Ct. at 2900. In other words, a challenged regulation "must ... do no more than duplicate the result that could have been achieved in the courts-by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." Id. The county acknowledges these principles but does not contend that the mining of sand is a nuisance. A cursory review of Minnesota caselaw does not reveal that the mining of sand or gravel is a nuisance per se . See, e.g. , Scott County Lumber Co. v. City of Shakopee , 417 N.W.2d 721, 728 (Minn. App. 1988) (reversing city's denial of conditional-use permit for expansion of gravel pit because decision was arbitrary and capricious), review denied (Minn. Mar. 23, 1988). The district court could not reasonably find that the mining of silica sand in Winona County is a nuisance per se because the county issued a conditional-use permit to the Nisbit mine in 2013. The county determined at that time that there was no need for an environmental-impact statement with respect to the Nisbit mine, and this court affirmed that determination on appellate review. See In re Environmental Impact Statement re Nisbit Quarry , 849 N.W.2d 71, 84 (Minn. App. 2014).
The majority opinion upholds the district court's reasoning on slightly different grounds. The majority opinion reasons that Minnesota Sands does not have a compensable property interest on the ground that it has lost its leasehold interests.
*795 See supra at 783-84. There is nothing in the record to suggest that Minnesota Sands has lost its leasehold interests. A simple review of the six leases indicates that each lease remains in effect. Three leases have an original term that ends "five years after the issuance of a conditional-use permit." Two leases had an original term ending in October 2016 but were amended in 2015 to terminate either five years after all regulatory approvals or in 2023, whichever is earlier. The sixth lease was executed in 2015 and terminates either five years after all regulatory approvals or in 2023, whichever is earlier. None of the six leases has expired. The majority opinion relies on a lease provision stating that Minnesota Sands's "obligations under this Agreement are conditioned upon [Minnesota Sands] obtaining any zoning or governmental approvals required" for the mining of silica sand. See supra at 784. Minnesota Sands's principal obligation toward the six lessors is to pay royalties based on the volume of silica sand that is mined. The clause concerning Minnesota Sands's obligations under each lease does not affect Minnesota Sands's rights under each lease, which have not expired.
In essence, the majority opinion reasons that Minnesota Sands does not have a compensable property interest because it does not have a conditional-use permit. But of course, Minnesota Sands cannot obtain a conditional-use permit because the county will not grant one because of the ordinance that is being challenged in this case. As described above, the majority's reasoning is inconsistent with the supreme court's opinion in Wensmann Realty , in which the property owner's desire to develop its property was forbidden by the city's comprehensive plan, yet the supreme court ruled in the property owner's favor and reversed and remanded for further consideration of the property owner's takings claim. See 734 N.W.2d at 628-29, 641-42. The majority's reasoning also is inconsistent with the United States Supreme Court's opinion in Palazzolo v. Rhode Island , 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), in which a state agency made a similar attempt to defeat a property owner's takings claim by narrowly defining the property owner's property interest according to the agency's own terms. The Supreme Court rejected the agency's argument, stating, "The State may not put so potent a Hobbesian stick into the Lockean bundle." Id. at 627, 121 S.Ct. at 2462. The Supreme Court explained that to accept the agency's argument "would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable." Id. at 627, 121 S.Ct. at 2462-63.
Thus, the district court's first reason for rejecting Minnesota Sands's regulatory takings claims is erroneous.
B.
The district court's second reason for rejecting Minnesota Sands's regulatory takings claims is that Minnesota Sands "fail[ed] to show that the property ... leased is deprived of 'all economic value.' " The district court explained that, even though the county's zoning ordinance prohibits Minnesota Sands from mining "industrial minerals," the ordinance would allow Minnesota Sands to mine "construction minerals," so long as it satisfied the requirements of a conditional-use permit. The district court concluded, "While Minnesota Sands would not obtain as much money as they would have preferred from their leases through this process, their argument that their lease is now deprived of 'all economic value' is disingenuous given these facts."
To establish a total regulatory taking, Minnesota Sands must prove that the county's zoning ordinance caused the *796 "complete elimination of value" to its property. See Lucas , 505 U.S. at 1019 & n.8, 112 S.Ct. at 2895 & n.8. Before determining whether all value has been eliminated, it is necessary to first determine the relevant parcel of property. Murr , 137 S.Ct. at 1943-46. In Penn Central , the Supreme Court set forth the "parcel as a whole" rule for determining the relevant parcel of property in a takings claim:
"Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole ....
438 U.S. at 130-31, 98 S.Ct. at 2662 (emphasis added). Just last year, the Supreme Court applied the parcel-as-a-whole rule to a total takings claim. See Murr , 137 S.Ct. at 1943-45. In doing so, the Supreme Court identified three factors that determine "the proper unit of property" in a regulatory takings claim: (1) "the treatment of the land under state and local law"; (2) "the physical characteristics of the land"; and (3) "the prospective value of the regulated land." Id. at 1943, 1945.
Minnesota Sands contends that the county's zoning ordinance completely eliminates the value of its leasehold interests in six parcels of Winona County property. In each lease, Minnesota Sands acquired a portion of the mineral interests in the property, specifically, the right to mine silica sand to be used in hydraulic fracturing. Minnesota Sands essentially asks this court to determine the relevant parcel of property by severing each of the six properties in which Minnesota Sands has a leasehold interest in two different ways: first, by severing the mineral interests from the non-mineral interests, and, second, by severing the mineral interest in mining silica sand for hydraulic fracturing from the mineral interest in mining silica sand for other purposes.
Minnesota Sands's contention concerning the relevant parcels is inconsistent with the Supreme Court's application of the parcel-as-a-whole rule in Keystone Bituminous Coal Association , which concerned a Pennsylvania law that allowed the mining of no more than half of the coal underneath public buildings and dwellings to ensure that those buildings had structural support. 480 U.S. at 476-77, 107 S.Ct. at 1237-38. Certain coal-mining companies alleged a regulatory taking and attempted "to narrowly define certain segments of their property and assert that, when so defined, the [Pennsylvania law] denies them economically viable use." Id. at 478, 496, 107 S.Ct. at 1238, 1248. Specifically, the plaintiffs contended that the relevant parcel of property was the coal that was required to be left in place without being mined. Id. at 498, 107 S.Ct. at 1248. The Supreme Court rejected the contention, reasoning that the coal that must be left in place "do[es] not constitute a separate segment of property for takings law purposes." Id. Since Keystone , lower federal courts generally have rejected the argument that a mineral interest in real property, by itself, is the relevant parcel for purposes of a regulatory takings claim. See Appolo Fuels, Inc. v. United States , 381 F.3d 1338, 1346 (Fed. Cir. 2004) ; Cane Tennessee, Inc. v. United States , 54 Fed.Cl. 100, 105-09 (Fed. Cl. 2002) ; Stephenson v. United States , 33 Fed.Cl. 63, 66, 69-70 (Fed. Cl. 1994) ; see also Machipongo Land & Coal, Inc. v.Pennsylvania , 569 Pa. 3, 799 A.2d 751, 766 (2002) ; but see Whitney Benefits v. U.S, , 18 Cl. Ct. 394, 405 (Cl. Ct. 1989), aff'd , 926 F.2d 1169 (Fed. Cir. 1991). The Keystone opinion suggests not only that mineral interests may not be severed *797 from non-mineral interests but also that certain mineral interests may not be severed from other mineral interests. See 480 U.S. at 498, 107 S.Ct. at 1248 ; see also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency , 535 U.S. 302, 331, 122 S.Ct. 1465, 1483, 152 L.Ed.2d 517 (2002) (stating that "defining the property interest taken in terms of the very regulation being challenged is circular").
Accordingly, the relevant parcels for purposes of Minnesota Sands's regulatory takings claims are the entireties of the six properties in which Minnesota Sands has leased mineral interests. Given that definition of the relevant parcels, Minnesota Sands cannot establish a total regulatory takings claim because it cannot prove that the county's zoning ordinance caused the "complete elimination of value" of any of the six parcels of property. See Lucas , 505 U.S. at 1019 & n.8, 112 S.Ct. at 2895 & n.8. This is so because sand may be mined at each of the six properties so long as it is sold for "local construction purposes." WCZO § 4.2 In addition, Minnesota Sands has not attempted to prove that any of the six properties, when considered as a whole, has no economic value because of the county's zoning ordinance. Minnesota Sands's total regulatory takings claim fails because it is based on an extremely narrow definition of the relevant parcels of property.
Thus, the district court's second reason for rejecting Minnesota Sands's regulatory takings claims is not erroneous with respect to Minnesota Sands's total regulatory takings claim.
C.
The district court's second reason for rejecting Minnesota Sands's regulatory takings claims does not resolve the partial regulatory takings claim. Whether the relevant parcels are defined narrowly or broadly, it is necessary to apply the three-factor Penn Central test to determine whether the county's zoning ordinance amounts to a partial regulatory taking of Minnesota Sands's property rights. The district court did not apply the three-factor Penn Central test to the facts and circumstances of this case. Thus, I would reverse in part and remand to the district court with instructions to apply the three-factor Penn Central test and to resolve the parties' arguments concerning Minnesota Sands's partial regulatory takings claim, based on the premise that the relevant parcels are the entire properties in which Minnesota Sands has leasehold interests. See Palazzolo , 533 U.S. at 630, 632, 121 S.Ct. at 2464-65 (remanding to district court for application of Penn Central test to partial regulatory takings claim); Woodbury Place Partners v. City of Woodbury , 492 N.W.2d 258, 263 (Minn. App. 1992) (same), review denied (Minn. Jan. 15, 1993). Because Minnesota Sands has invoked Minnesota's takings clause as well as the federal Takings Clause, the district court also should consider and resolve Minnesota Sands's state-law partial regulatory takings claim. See Minn. Const. art. I, § 13 ; DeCook , 796 N.W.2d at 305-06 ; Johnson , 667 N.W.2d at 115-16 ; Strom , 493 N.W.2d at 558.
Therefore, I would conclude that the district court did not err by granting the county's motion for summary judgment on Minnesota Sands's total regulatory takings claim, but I would conclude that the district court erred by granting the county's motion on Minnesota Sands's partial regulatory takings claim.

The dissent argues that this quotation is not applicable to a facial-discrimination analysis because it is taken from the analysis under the Pike -balancing test. But this quotation regarding the burden imposed on the parties, is applicable to our initial discrimination determination, as the word "discrimination" is defined as "differential treatment of in-state and out-of-state interests that benefits the former and burdens the latter." Oregon Waste Sys. , 511 U.S. at 99, 114 S.Ct. at 1350.

The transportation provision of the zoning-ordinance amendment does not apply to the Nisbit operation either, which is instead governed by the numerous transportation provisions detailed in its CUP.

Minnesota Sands' argument relates only to facial discrimination under the dormant Commerce Clause and does not offer argument regarding discriminatory effects. See generally Hunt , 432 U.S. at 350-51, 97 S.Ct. at 2446 (analyzing statute's discriminatory impact on interstate commerce "[d]espite the statute's facial neutrality"). Thus, we need not and do not address this argument because those issues not briefed on appeal are forfeited and not properly before this court. State Dep't of Labor & Industry v. Wintz Parcel Drivers, Inc. , 558 N.W.2d 480, 480 (Minn. 1997).

And since July 1, 2013, entities seeking to mine silica sand in Minnesota must complete an environmental-impact statement before submitting a CUP application if the project seeks to excavate 20 or more acres of land, as Minnesota Sands sought to. See Minn. Stat. § 116C.991, subd. (a)(1) (2016). Minnesota Sands also failed to meet this requirement.

The majority opinion assumes without deciding that the county's zoning ordinance "implicates" interstate commerce. See supra at 779. The ordinance plainly implicates interstate commerce because the threshold for such a determination is quite low. See Gonzales v. Raich , 545 U.S. 1, 17-22, 125 S.Ct. 2195, 2205-09, 162 L.Ed.2d 1 (2005) (holding that, under Commerce Clause, Congress may prohibit local cultivation and use of marijuana for medicinal purposes because such activity has substantial effect on interstate commerce); Wickard v. Filburn , 317 U.S. 111, 127-28, 63 S.Ct. 82, 90, 87 L.Ed. 122 (1942) (holding that, under Commerce Clause, Congress may regulate production of wheat grown and harvested solely for personal consumption because failure to regulate activity would undercut regulation of interstate commerce). Furthermore, the United States Supreme Court has held that Congress's authority under the Commerce Clause includes the power to regulate mining, even though land-use regulation typically is within the inherent police power of the states and their political subdivisions. Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc. , 452 U.S. 264, 275-83, 101 S.Ct. 2352, 2359-63, 69 L.Ed.2d 1 (1981) (reviewing Surface Mining Control & Reclamation Act of 1977, 30 U.S.C. § 1201 et seq. (1976 ed., Supp. III) ).

The majority opinion does not consider whether the county's zoning ordinance is discriminatory in practical effect. See supra at 782 n.3. The court should do so because Minnesota Sands does not limit its argument to the issue of facial discrimination. At oral argument, Minnesota Sands clearly argued that the county's zoning ordinance is both facially discriminatory and discriminatory in practical effect.